Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO.:  3:19-cv-779-J-39JBT

--------------------------X
PAUL EMMANUEL KNIGHT,        )
DC#063422,                   )
                             )
            Plaintiff,       )
                             )  CONTINUED DEPOSITION OF
v                            )  PAUL EMMANUEL KNIGHT
                             )
KEEGAN M. GRAY, MATTHEW      )
KURTH, AUSTIN MERRITT,       )
BRETT GILLESPIE, JACK        )
VANALLEN, MARTIN G.          )
SANDERS, JOEL ECONOM,        )
and G. ESPINO, M.D.,         )
                             )
            Defendants.      )
--------------------------X

        TAKEN BY:    Chase Hattaway, Esquire

        DATE:        Thursday, January 21, 2021

        TIME:        10:00 a.m. - 10:54 a.m.

        PLACE:       Via teleconference

                    Heidi Fabrikant, FPR
                 Executive Reporting Service
                  Ulmerton Business Center
                  13555 Automobile Boulevard
                         Suite 100
                 Clearwater, Florida  33762

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 2

```
 1                   APPEARANCES
              (Appearing telephonically)
 2

 3

 4              Paul Emmanuel Knight
              c/o Apalachicola Prison
 5               52 West Unit Drive
              Sneads, Florida  32460
 6

 7

 8
         EUGENIA ALEXANDRA IZMAYLOVA, ESQUIRE
 9         Office of the Attorney General
             501 East Kennedy Boulevard
10                  Suite 1100
             Tampa, Florida  33602-5242
11                 813-233-2880
         eugenia.izmaylova@myfloridalegal.com
12           Attorney for the Defendants

13

14

15            CHASE HATTAWAY, ESQUIRE
             Rumberger Kirk & Caldwell
16                 PO Box 1873
             Orlando, Florida 32802-1873
17                 407-872-7300
             chattaway@rumberger.com
18         Attorney for Defendant Dr. Espino

19

20

21

22

23

24

25
```

Executive Reporting Service

Page 3

1                            INDEX

2

    DEPOSITION OF PAUL EMMANUEL KNIGHT
3

4   Direct Examination by Mr. Hattaway                4

5   Certification of Oath by Amy Glisson             38

6   Certification of Reporter                        39

7   Errata Sheet                                     40

8   Read and Sign Letter                             41

9

10                    PLAINTIFF'S EXHIBITS

11    Number              Description             Page

12                     (No Exhibits)

13

14

15                    DEFENDANTS' EXHIBITS

     Number              Description             Page
16
                       (No Exhibits)
17

18

19

20

21

22

23

24

25

Executive Reporting Service

Page 4

```
 1    THEREUPON,

 2                      PAUL E. KNIGHT,

 3    having been first duly sworn by Amy Glisson, Notary

 4    Public, State of Florida, was examined via telephone

 5    and testified as follows:

 6                 THE DEPONENT:  Yes.

 7                      DIRECT EXAMINATION

 8    BY MR. HATTAWAY:

 9       Q.    All right.  Good morning.  My name is Chase

10    Hattaway.  I understand you've been deposed one time in

11    this case already.  I'm going to go over some things

12    that you may have been told before.  But if you don't

13    understand or you don't hear one of my questions, will

14    you please ask me to repeat or rephrase the question?

15       A.    Yes, sir.

16       Q.    All right.  If there's some reason that you

17    need to take a break, will you go ahead and let me

18    know?

19       A.    Yes.

20       Q.    All right.  Have you taken any medication in

21    the past 24 hours?

22       A.    Yes, my psych meds.

23       Q.    Okay.  Is there any reason you are unable to

24    testify truthfully and accurately here this morning?

25       A.    No.
```

Executive Reporting Service

Page 5

```
 1        Q.    All right.  What's your date of birth?
 2        A.    8/27/1958.
 3        Q.    All right.  And where are you currently
 4   incarcerated?
 5        A.    Apalachicola.
 6        Q.    How long have you been at Apalachicola?
 7        A.    Since last Friday -- last Thursday.
 8        Q.    All right.  And where were you before that,
 9   before moving to Apalachicola?
10        A.    Santa Rosa.
11        Q.    And how long were you at Santa Rosa?
12        A.    About four months.
13        Q.    All right.  And where were you before Santa
14   Rosa?
15        A.    UCI, Union Correctional Institution.
16        Q.    All right.  And how long were you there?
17        A.    About -- I don't know -- three months, four
18   months.
19        Q.    All right.  Where were you before that?
20        A.    Santa Rosa Annex.
21        Q.    All right.  And how long were you at that
22   location?
23        A.    A couple of months.
24        Q.    All right.  And where were you before that?
25        A.    Florida State Prison.
```

Executive Reporting Service

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 6

1       Q.    And how long were you there?

2       A.    About a year.

3       Q.    Okay.  And where were you in May of 2019 when

4    the issues that formed the basis of this lawsuit

5    occurred?

6       A.    Florida State Prison on the E-wing.

7       Q.    Okay.  And how long is your sentence?

8       A.    45 years, 3 mandatory.

9       Q.    Okay.  Okay.  All right.  Have you ever been

10   diagnosed with high blood pressure before?

11      A.    I think there's something in the medical

12   records concerning high blood.  There is a lot of

13   things.  I just don't take no medication for it.

14      Q.    Okay.  Have you ever been diagnosed with

15   diabetes before?

16      A.    No.

17      Q.    All right.  To your knowledge, have you ever

18   had a stroke before?

19      A.    No.

20      Q.    All right.  To your knowledge, do you have

21   any problems with your heart?

22      A.    I'm going to say no, but they've been taking

23   me up there and putting me on the EKG.  That's for the

24   heart -- monitoring the heart, ain't it?

25      Q.    I believe so.

Executive Reporting Service

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

1       A.     Huh?

2       Q.     And to your knowledge, have you ever been

3    diagnosed with cancer before?

4       A.     No.

5       Q.     All right.  Now, I think you mentioned that

6    in the past 24 hours you've taken what kind of

7    medication?

8       A.     Prozac, 40 milligrams of Prozac.

9       Q.     All right.  And what do you take that for?

10      A.     Depression.

11      Q.     All right.  Have you been diagnosed with any

12   other psychological or mental health conditions other

13   than depression or perhaps anxiety?

14      A.     I'm on psych meds for anxiety, Vistaril.

15      Q.     Okay.

16      A.     100 milligrams of Vistaril for anxiety.

17      Q.     All right.  Have you been diagnosed with any

18   psychological or mental health conditions other than

19   depression or anxiety?

20      A.     No, not to my knowledge.

21      Q.     All right.  Okay.

22             Now, I understand you've given a deposition

23   in this case already; is that correct?

24      A.     Yeah, last Thursday.

25      Q.     Right.  Have you given any other depositions

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

1     in this case before?  Well, strike that.

2              Have you ever given depositions in any other

3     lawsuits before?

4         A.    No.

5         Q.    All right.  I want to real briefly just go

6     through some of the allegations in your complaint just

7     to make sure that I understand this.  I'm going to try

8     and be as succinct as possible.

9              So as I understand it, you claim that on May

10    1, 2019, Defendant Sanders approached your cell and

11    ordered you to cuff up to be placed on property

12    restriction but you refused; is that correct?

13        A.    Yes.

14        Q.    All right.  You allege that Defendants Econom

15    and Gillespie, acting on the orders of Defendant

16    Sanders, used chemical agents on you; correct?

17        A.    Yes.

18        Q.    You then allege that a cell extraction team

19    consisting of Defendants Gray, Merritt, Kurth and

20    Vanallen came to your cell; correct?

21        A.    Yes.

22        Q.    And you allege that those defendants used

23    unnecessary and excessive force; correct?

24        A.    They beat me, yes.

25        Q.    Okay.  And then you allege that you were

Executive Reporting Service

Page 9

1    taken to the B wing for a decontamination shower where

2    some of those defendants further abused you; is that

3    correct?

4        A.    Yes.

5        Q.    Okay.  And from there you allege that you

6    were taken to medical where you received treatment that

7    you allege was obviously wrong; correct?

8        A.    I received no treatment from the doctor.  He

9    looked at my eye and left the room.

10       Q.    Right.  You did receive treatment from the

11   nursing staff; correct?

12       A.    Yeah.  Two nurses, yeah.

13       Q.    Okay.  And then later you allege on

14   August 26, 2019, that Defendant Espino told you that

15   your x-rays were normal; is that correct?

16       A.    Exactly.  Yes.

17       Q.    Right.  And what part of the body did you

18   receive those x-rays to?

19       A.    On my hand, on my head, and my left feet

20   [sic] where they broke the little toe.

21       Q.    Okay.  So let's talk a little about your

22   injuries and treatment.  So again on May 1, 2019, you

23   were transferred from the B wing to the medical unit;

24   is that correct?

25       A.    On May 1st?

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 10

1    Q.   Correct.

2    A.   Yes.

3    Q.   Okay.  Okay.  Now, do you have any reason to

4  dispute that the medical team took your temperature on

5  May 1st and your temperature was 98 degrees?

6    A.   No.  I don't -- I don't -- I don't remember

7  that.

8    Q.   Okay.  Do you have any reason to dispute that

9  the medical team took your pulse on 5/1 and your pulse

10  was 95 beats per minute?

11    A.   I don't know.  I don't know that information.

12    Q.   Okay.  Do you have any reason to dispute that

13  the medical team took your blood pressure on May 1st

14  and it was 148/90?

15    A.   I don't know that information.

16    Q.   Okay.  That's just not something that you

17  remember?

18    A.   They ain't never tell me what it was.

19  Everything you just read off --

20    Q.   Okay.

21    A.   -- they ain't never told me what it was.  I

22  don't know.

23    Q.   Okay.  Now, can you tell me what injuries you

24  believe you had when you arrived at medical on May 1st?

25    A.   Left and right eye, swollen left eye; top of

Executive Reporting Service

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

1    my head bleeding.  They broke my little toe; the bone

2    is sticking to the right right now and the toe is

3    sticking to the left.  They did some damage to my hand.

4    I don't know if one of them know anything about nerve

5    damage, but they did some damage to my hand that I'm

6    going through paralysis right now with numbness in my

7    fingers and running all the way up that right arm to my

8    shoulder.  That's going on right now ever since the

9    incident.

10          I've been filing grievances concerning the

11   neurologist, and I done been denied all the way up to

12   today from the injuries.

13       Q.   Okay.  All right.  I'm writing down

14   everything you're telling me, so if there is a pause,

15   it's because I'm writing down notes.

16          So I just want to make sure I understand.

17   When you arrived at medical you had injuries to your

18   left eye, right eye, the top of your head was bleeding,

19   you had a broken left toe, and also injuries to your

20   hand.

21          Is that a complete list of all of the

22   injuries you had?

23       A.   Yes.

24       Q.   Okay.  All right.  So let's go through some

25   of those.  I understand in medical, I think it was, the

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 12

1      nurses provided -- well, strike that.

2              Let's start with your eye.  I'm going to

3      start with your eye.  Okay?  I'm going to talk to you

4      about your eye injury and some of the treatment that

5      you got from the staff.

6              The treatment that I understand you were

7      given for your eye was a Band-Aid and Dermabond.  Do

8      you recall that?

9      A.     They put some type of -- I don't know what

10     the medication was, but they taped it around the eye,

11     around the wound --

12     Q.     Okay.

13     A.     -- around the right eye.  They didn't put no

14     Band-Aid on there.

15     Q.     Okay.  So your recollection is the staff put

16     some type of medication directly on your eye, and

17     you're just not sure what the medication was; is that

18     correct?

19     A.     Right.  On the cut, yes.

20     Q.     Okay.  Now, what other treatment do you

21     believe you should have been given to your eye, if any?

22     A.     I don't know.  You hear me?  I don't know.

23     Being truthful, I don't know.  All I know is I was

24     beat.  I don't know what type of treatment I needed.  I

25     know that I bled over 24 hours in that cell when they

Executive Reporting Service

Page 13

```
 1    put me back in there from my head and eye.  The blood
 2    is still in that cell right now.  They painted over it.
 3    I know that.
 4        Q.    Okay.  Now, you said you bled from which eye
 5    for 24 hours?
 6        A.    My right eye.
 7        Q.    Okay.
 8        A.    They didn't put no tape on my eye.  They
 9    didn't put no tape on the wound on the top of my head.
10    The gauze is still there right now.  They didn't do no
11    -- nothing.  Nothing.  No nurse.  No doctor.
12        Q.    Okay.
13        A.    They left --
14        Q.    Okay.  So I just want to make sure
15    I -- sorry.  Go ahead.
16        A.    I say I was left to bleed in that cell.
17        Q.    Okay.  So I just want to make sure I
18    understand your testimony.  With respect to your right
19    eye, someone put medication directly on your right eye
20    and then the bleeding continued for 24 hours, and then
21    your belief is that the bleeding stopped on its own
22    after 24 hours; is that correct?
23        A.    Correct.
24        Q.    Okay.  Did you have any complaints related to
25    your left eye?
```

Electronically signed by Heidi Fabrikant (401-362-739-5523)                                          562002da-4fd9-429d-9246-41fa727f0b9f

Page 14

1        A.    It was closed.

2        Q.    It was swollen closed?

3        A.    Yes.  It was beat closed, yes.

4        Q.    Okay.  Now, how long did it take for the

5   complaints related to your right eye to completely go

6   away?

7        A.    At least three weeks, a little over

8   three weeks.

9        Q.    Okay.  And how long did it take for all of

10  the complaints related to your left eye to completely

11  go away?

12       A.    I don't know.  After about two weeks, it

13  started to open up.  I could see a little bit.  It

14  actually healed on its own.

15       Q.    Okay.

16       A.    About the same time as the right.

17       Q.    All right.  Now, you mentioned some injuries

18  to your hand.  Has any doctor ever told you that you

19  have damage to the nerve in your hand?

20       A.    A nurse at Santa Rosa said I will be in pain

21  for the rest of my life.  I wrote them a request and

22  asked them to put it in -- to answer that request and

23  put it in writing, and they never answered it back.

24       Q.    Okay.  Okay.  So you said a nurse at Santa

25  Rosa told you you would be in pain for the rest of your

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 15

1    life?

2         A.    Yes.  Because when they put the cuffs on me

3    behind my back, she said the cuffs came down and

4    pinched into the nerve.  That's where the numbness is

5    coming from in my hand, running up my arm, and I forgot

6    the medical term that he used.  He gave me double cuff

7    pads in back, so they can't handcuff me behind my back

8    with one set of handcuffs because they had to pull my

9    shoulders together and force the cuffs on me.  That was

10   causing me pain, and he gave me double cuff pads, which

11   I've got right now, and put me on an ibuprofen with no

12   refills because I guess it's supposed to do something

13   to you if you take it too long.  I don't know.

14        Q.    Okay.  So let me just go back a little bit.

15   What was the name of the nurse who told you you would

16   be in pain for the rest of your life?

17        A.    I'm going to spell it off of this pass.  Let

18   me get my glasses.  I can't see.  Hold up.

19            THE REPORTER:  Mr. Knight, is there a way you

20        can move closer to your microphone?

21            THE DEPONENT:  B, period, "B" as in "boy"

22        G-a-r-r-e-t-t, the initials APRN, Santa Rosa CI

23        Annex.  That's the name off the medical pass he

24        gave me.

25        Q.    Okay.  So is it "E. Barrett [sic], APRN"?

Executive Reporting Service

Page 16

1       A.    Huh?  It was "B," his first initial.  It was
2    "B" as in "boy."
3       Q.    Oh, okay.
4       A.    That's his first initial.  The name is --
5       Q.    Okay.
6       A.    And the name G-a-r-r-e-t-t.
7       Q.    All right.  B. Garrett; right?
8       A.    Yes.
9       Q.    Okay.  And are you right-handed or
10   left-handed?
11      A.    Right-handed.
12      Q.    In other words, you write with your right
13   hand?
14      A.    Yes.
15      Q.    Okay.  And what hand do you claim was
16   injured?
17      A.    Both.  They were trying to break my hands.
18      Q.    Okay.
19      A.    The nerve damage is in my right hand.  That's
20   where all the numbness to my right fingers, hand, and
21   it runs up my arm to my right shoulder.  That's where
22   the paralysis is at.
23      Q.    Okay.
24      A.    Some type of nerve damage, but they ain't
25   acknowledging that.

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 17

1          Q.    Okay.

2                Now, has anyone other than this nurse told

3     you that you have damage to your nerve?

4          A.    No.

5          Q.    Okay.  And to be clear, all that the nurse

6     told you was that you would be in pain for the rest of

7     your life; correct?

8          A.    Yes.

9          Q.    Okay.  Do you know what treatment you should

10    have received but you did not receive?

11         A.    Yes.  I know I should see a neurologist --

12         Q.    Okay.

13         A.    -- for nerve damage.

14         Q.    Do you know what type of treatment that

15    neurologist would prescribe to you?

16         A.    No, I don't know.  I need a nerve specialist.

17    That's a neurologist; right?  Is a nerve specialist a

18    neurologist?  Because the x-rays showed the damage.  It

19    showed bone structure damage.

20         Q.    And who prescribed the x-rays?

21         A.    A black doctor at FSP.  I don't know his

22    name.  I've been trying to get his name through

23    discovery.  They won't release his name.

24         Q.    Okay.  Now, when you were seen in medical on

25    May 1, 2019, did you have any visible injuries to your

Executive Reporting Service

Page 18

1    hands or was it all internal injuries?

2         A.    Yeah, the visible signs was the swelling of

3    my fingers.

4              THE REPORTER:  Is there a way, Mr. Knight,

5         you can move closer to your microphone?

6              THE DEPONENT:  They got me with this Corona

7         mask on.  They told me I got to keep it on.

8              THE REPORTER:  Okay.  Thank you.

9              MR. HATTAWAY:  And, Madam Court Reporter, if

10        you can't hear him, just speak up.  I don't mind.

11             THE REPORTER:  Okay.

12             MR.  HATTAWAY:  Let us know.

13             THE REPORTER:  Thank you.

14   BY MR. HATTAWAY:

15        Q.    Okay.  When you -- so I just want to make

16   sure I understand.  When you arrived at medical on May

17   1, 2019, is it your belief that your fingers were

18   already swollen, or do you believe that that happened

19   later?

20        A.    All my injuries come from the beating.  When

21   them officers beat me, my hands weren't no already

22   swollen.  How they going to swell up on their own?

23        Q.    Right.  I think maybe I asked a, you know,

24   confusing question.

25             So I understand your contention is the guards

Executive Reporting Service

Page 19

1    beat you up; right?

2        A.    Yes.

3        Q.    And so my question is when you arrived at

4    medical on May 1, 2019, were your fingers swollen at

5    that time, or did the swelling in your fingers happen

6    after you left medical on May 1, 2019?

7        A.    It happened during the incident.

8        Q.    Okay.

9        A.    It happened during the incident.  They was

10   trying to break my hands and my fingers like they broke

11   my little toe.  It was for writing.  I filed a case in

12   court and I used the warden as a defendant.  They read

13   it and they beat me.  That's what's going on.

14       Q.    Okay.  Now let's talk about -- you also

15   sustained injuries to your left toe; is that correct?

16       A.    Yes, my little toe.

17       Q.    Okay.  And is that on your right foot or your

18   left foot?

19       A.    My left foot, little toe on the left foot.

20   They snapped it.  They snapped the toe.

21       Q.    And "they," you mean the guards; right?

22       A.    Yes, during the beating.

23       Q.    Okay.  And did the medical team tape your

24   toes together?

25       A.    No.  Dr. Espino told me later after the

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 20

```
 1    x-rays -- after he reviewed the x-rays and called me up

 2    there and told me the x-ray was normal, he told me to

 3    tape my toes together with another toe.  I told him "I

 4    don't have no tape."  He gave me some tape and the

 5    nurse taped my toes, but that was like the middle of

 6    the month or the end part of the month on the 26th or

 7    somewhere like that after the x-rays was done.  He

 8    didn't order no x-rays.

 9         Q.    Okay.  So let me just make sure I understand.

10    So who ordered the x-rays?

11         A.    The black doctor.

12         Q.    Okay.  On the day of the incident, did the

13    nurses perform any treatment to your toes on your left

14    foot?

15         A.    No.

16         Q.    Okay.  And what did the injury to your left

17    foot look like?

18         A.    It snapped the toe.  The bone inside my toe

19    on my left foot is protruding through the skin right

20    now facing my right foot and the toe is facing the left

21    side of my body.

22         Q.    Hang on.  Are you saying that the bone is

23    sticking through the skin?

24         A.    Yes.  It's protruding up against the skin.

25    It's pointed out.  You can see the bone.  You can look
```

Electronically signed by Heidi Fabrikant (401-362-739-5523)                                562002da-4fd9-429d-9246-41fa727f0b9f

Page 21

1    down and see it.

2         Q.    Okay.  But is it sticking through the skin?

3         A.    No.

4         Q.    Okay.

5         A.    It ain't break no skin.

6         Q.    Okay.  And on the day of the incident, you

7    weren't bleeding on your left foot; correct?

8         A.    No.

9         Q.    Okay.

10        A.    No.

11        Q.    Okay.  And do you know what treatment you

12   should have been provided for your left foot?

13        A.    No.

14        Q.    Okay.  And I think the last injury that you

15   told me about was to your head.  You said you were

16   bleeding from your head?

17        A.    Yes.

18        Q.    And where specifically were you bleeding

19   from?

20        A.    It's at the top of my head but towards the

21   back.  You can see the big old scar right there.  It's

22   scarred up, a big wide scar.  You could see it.

23        Q.    And did anyone on the medical team provide

24   you a Band-Aid or guaze?

25        A.    For my head wound?

Electronically signed by Heidi Fabrikant (401-362-739-5523)                                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 22

1      Q.    Yes, sir.

2      A.    No.  They put something on my eye.

3      Q.    How long did it -- sorry.

4      A.    Go ahead.

5      Q.    Yeah.  Sorry.  I'm not trying to talk over

6   you.  It's a little hard with the phone.

7            So how long did it take for the bleeding on

8   your head to stop?

9      A.    Until I bled over 24 hours in that cell, man,

10   with no treatment, out of my eye and my head.  That

11   story never changed.  It happened.

12      Q.    Okay.  And so your allegation is that your

13   head wound bled for 24 hours and then resolved on its

14   own without any treatment from anyone; correct?

15      A.    Over 24 hours with no treatment and denial of

16   me declaring medical emergency to staff, yes.

17      Q.    Okay.  I just want to make sure I understand.

18   Your allegation is that your head wound stopped

19   bleeding without anyone providing any sort of treatment

20   to you; is that correct?

21      A.    Yes.

22      Q.    All right.  Okay.  Do you have any other

23   complaints related to your head other than that one

24   bleeding wound?

25      A.    No.

Executive Reporting Service

Page 23

1        Q.    Okay.  And once your head stopped bleeding,

2   did you have any other problems with it?

3        A.    No.

4        Q.    All right.  Did you ever lose consciousness

5   during the alleged assault by the guards?

6        A.    I don't -- I don't -- I don't know whether

7   there was a sense of losing conscious [sic], but I was

8   beaten like senseless where -- how can I say it? -- you

9   get beat like you're drunk, like staggering-like.

10           Do you understand what I'm trying to say?

11       Q.    Well, kind of.  I guess my question is, you

12   know, during the beating do you believe that you ever

13   lost consciousness where you actually passed out?

14       A.    No.  It wasn't a sense of me losing

15   conscious.  I was beaten to a point of disorientation.

16   I was disoriented.

17       Q.    All right.

18       A.    They picked me up and I was wobbling.  They

19   literally had to drag me really, because I was beaten

20   senseless.

21       Q.    And then at any point after you arrived at

22   medical, did you ever lose consciousness?

23       A.    No.

24       Q.    All right.  Okay.  I think we talked about

25   your injuries, but just so I have a complete list, you

Executive Reporting Service

Page 24

1    claim on May 1st when you arrived at medical you had

2    injuries to your left and right eye, top of your head,

3    broken left toe, and then damage to your hand.  That's

4    right?

5        A.    Yes, hand and arm.

6        Q.    Okay.  And the damage to your arm is the pain

7    that goes from your hand up to your shoulder; is that

8    correct?

9        A.    Yes, it's numbness.  It'll go numb.  And when

10   I write, it'll go numb and it'll go to hurt.

11       Q.    All right.

12       A.    That's some type of nerve damage, yes.

13       Q.    Okay.  So now do you remember the names of

14   the nurses who treated you in medical on May 1, 2019?

15       A.    No.  I asked for it in the deposition, but

16   they wouldn't give it to me.  They objected to me

17   asking that question.

18            Dr. Espino don't have control over releasing

19   the name or the identity.  I'm filing a motion to the

20   court now concerning that issue.  He ain't gave me

21   nothing.

22       Q.    Okay.  Do you remember how many nurses

23   provided treatment to you?

24       A.    Two.

25       Q.    And were they males or females?

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 25

1        A.      Two ladies, two white ladies, and the black

2    nurse was logging down everything that they was saying

3    to him.

4        Q.      Was the black nurse a male or a female?

5        A.      Three females: one black, two white.

6        Q.      All right.  So on May 1, 2019, two white

7    females provided treatment to you and a black female

8    nurse documented the treatment; is that correct?

9        A.      They provided -- the two white females

10   provided treatment to my right eye --

11       Q.      Right.

12       A.      -- and something on my nose.  It was some

13   type of bandage or something on my nose.  That's all

14   the treatment they provided.  They ain't provide no

15   treatment as in a whole -- every aspect of treatment.

16       Q.      Sure.

17       A.      No.  They didn't provide no whole treatment

18   to me.  My eye and my nose, that's it.

19       Q.      Yeah, and I understand that.  I just want to

20   make sure I understand who did what.  So the black

21   female nurse, her sole role in all this was to take

22   down notes; is that correct?

23       A.      Yes.

24       Q.      And the two female white nurses were the ones

25   who actually provided some treatment to you; is that

Executive Reporting Service

Page 26

1    correct?

2         A.   Yes, to my eye and to my nose.

3         Q.   Okay.  All right.  And which eye did you say

4    was swollen?

5         A.   Both of them was swollen, but the left I

6    couldn't see out of, period.

7         Q.   Do you know if there was any treatment that

8    you should have been provided for that eye?

9         A.   No.  I don't have no medical knowledge.

10        Q.   Right.  And when did Defendant Espino come

11   into medical to see you?

12        A.   When I first went in the exam room, he came

13   in there.

14        Q.   And how long was he present?

15        A.   No more than three or four minutes.  He

16   looked at my eye.  He looked at the right eye where it

17   was bleed [sic] and he touched it.  He was touching it

18   around the wound and it was hurting.  When he got

19   through with that right eye, he just left out the room.

20        Q.   All right.

21        A.   The two nurses -- the two white nurses come

22   into motion and they put something, got something,

23   tapped it with the eye or some type of medication or

24   whatever they put on the eye.

25             The other one did something to my nose and

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 27

1      put a little white -- I don't know.  It ain't a

2      Band-Aid, but it's something like that, I guess, I

3      don't know, across my nose.  That was the end of

4      treatment.  That's it.  Espino wasn't even in the room.

5      He left out.

6          Q.    Okay.

7          A.    He called me back later, and this was on May

8      the 1st.  Wednesday, Thursday, Friday, Saturday, Sunday

9      Monday, May 6th he put me on a medical call-out and

10     called me back up to medical and I went back up there.

11     That's when he was trying to open my left eye.

12             That's when the captain and the sergeant

13     jumped on me up there in medical, but that's not part

14     of the complaint.  You see what I'm saying?

15         Q.    Yeah.  I understand.  I understand.

16         A.    Yeah.  I didn't never bring them up in the

17     complaint.  That was six days later.  That's not part

18     of the complaint.

19         Q.    Okay.  So you're not suing Defendant Espino

20     for anything that happened on May 6, 2019; correct?

21         A.    No.

22         Q.    You agree with that; correct?

23         A.    Right.

24         Q.    Okay.  Okay.

25         A.    Right.  Nothing happened after the incident

Executive Reporting Service

Electronically signed by Heidi Fabrikant (401-362-739-5523)                                          562002da-4fd9-429d-9246-41fa727f0b9f

Page 28

1    of May 1st, no.

2        Q.    All right.  Okay.  So all I'll ask you about

3    May 1st then -- so I just want to make sure I

4    understand what you're telling me.  Defendant Espino

5    came into medical, he examined you for a few minutes,

6    touched your eye, you said it hurt, and then he left.

7    Then the nurses came back in and provided medicine to

8    one of your eyes and put a bandage on your nose; is

9    that correct?

10       A.    Yes, they never left out of the room.  After

11   he left, they came into motion and did what they did.

12   They never left out of the room.

13       Q.    When Defendant Espino was with you, were

14   there any nurses in the room?

15       A.    Yes.  The nurses and all of the officers

16   jumped on me.  Mental health was in there too.

17       Q.    Are we talking on May 1, 2019?

18       A.    All of them was in there.

19       Q.    Okay.  Hang on.  Hang on.  I think I'm

20   confused.

21       A.    Listen.  Listen.

22       Q.    I'm talking May 1, 2019, not May 6th.

23       A.    That's what I'm telling you about right now.

24       Q.    Okay.

25       A.    When I went to medical -- when security took

Executive Reporting Service

Electronically signed by Heidi Fabrikant (401-362-739-5523)                                    562002da-4fd9-429d-9246-41fa727f0b9f

1    me to medical, all of the ones and security that took

2    me to medical that jumped on me escorted me to medical.

3    Once we got to medical, the mental health director,

4    they call him Mr. E, and the other one named Mr.

5    Duncan, they was in the examination room with all of

6    the officers that jumped on me and Captain -- I'm going

7    to say Lieutenant Sanders.  All of them was in the

8    room.  The three nurses was in the room.

9            Dr. Espino come in there and he leaned over

10   and he looked at my eye.  He was touching around my eye

11   and I'm shying away from it because it was painful, and

12   he turned around and he walked out.  That was it.

13           Then the nurse came over and put some type of

14   salve, or whatever that was, on my eye; and the other

15   one put some type of bandage on my nose.  That was the

16   end of treatment.

17       Q.   Okay.  Okay.

18           Are you saying that the guards beat you up

19   again in medical on May 1st?

20       A.   No, not in medical.

21       Q.   Okay.  Okay.

22       A.   B wing --

23       Q.   Okay.  Okay.  Okay.

24       A.   -- in the shower.

25       Q.   Okay.  I understand.  I understand.  I

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 30

1     understand.  I understand.

2          Okay.  Bear with me.  I'm just looking over

3     my notes here.

4          Okay.  Have you -- as I understand it, you

5     received no treatment whatsoever for your eye injuries

6     after May 1, 2019; is that correct?

7     A.   Yes.

8     Q.   And you claim that you have never received

9     any treatment for your head wound; is that correct?

10    A.   Yes.

11    Q.   All right.  And you also claim that you have

12    never received any treatment other than being

13    prescribed ibuprofen for your hand; is that correct?

14    A.   Yes.

15    Q.   And you claim that you haven't been

16    prescribed any treatment for your toe; is that correct?

17    A.   Yes.  Other than wrapping it to another toe,

18    taping it to another toe, that was all.

19    Q.   Okay.  Were you able to walk out of medical

20    on May 1, 2019?

21    A.   Yes.

22    Q.   And the next day, May 2, 2019, were you able

23    to walk?

24    A.   Yes.

25    Q.   And you're still able to walk today?

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 31

1        A.    Yes.

2        Q.    Are you able to feed yourself?

3        A.    Yes.

4        Q.    Are you able to dress yourself?

5        A.    Yes.

6        Q.    Are you able to shower yourself?

7        A.    Yes.

8        Q.    Do you exercise?

9        A.    No.  I'm 62.  No.

10       Q.    And by the way, what year will you be

11   released from prison?

12       A.    The date is 2031; parole date is 2052.

13       Q.    By the way, do you wear glasses?

14       A.    Yes.

15       Q.    And back in May of 2019, did you wear

16   glasses?

17       A.    Yes.

18       Q.    And I assume your glasses came off during the

19   alleged assault by the guards?

20       A.    They throwed them away.  They throw away all

21   of my property.  I've got glaucoma.

22       Q.    How long have you had glaucoma?

23       A.    For a long time.  I've been in here for

24   40 years.

25       Q.    Okay.  And I think I know the answer to this,

Executive Reporting Service

Electronically signed by Heidi Fabrikant (401-362-739-5523)                         562002da-4fd9-429d-9246-41fa727f0b9f

Page 32

1    but I'll ask you anyway.

2          You're able to read and write; is that

3    correct?

4          A.    Yes.

5          Q.    When was the last time you were seen in

6    medical?

7          A.    About a month or so ago, they called me up --

8          Q.    And what were you seen for?

9          A.    EKG.

10         Q.    Okay.  And do you know the outcome of that

11   EKG?

12         A.    I didn't do it.

13         Q.    Why didn't you do it?

14         A.    Because they called me a week before that,

15   right, for an EKG.  They hooked everything up and they

16   did it.  A week later they called me back up there for

17   an EKG, so I asked the nurse, "Why you-all keep calling

18   me up here for an EKG?  I want to know what's wrong

19   with me."

20         She say, "I don't know.  All I know is I'm

21   scheduled to do it."

22         So I said, "I would like to know why is

23   you-all keep giving me an EKG?"

24         She said, "You going to accept it, or are you

25   going to refuse it?"

Electronically signed by Heidi Fabrikant (401-362-739-5523)                                    562002da-4fd9-429d-9246-41fa727f0b9f

Page 33

1           I said, "I ain't refusing nothing, I just

2    want to know."

3           So she told me to get the fuck out of her

4    face, so I wrote her up.

5      Q.    Okay.

6      A.    They won't tell me why they doing the EKG.  I

7    don't know what's going on.  I'm scared.  I'm afraid

8    they trying to kill me.

9      Q.    Okay.  Okay.  And that's the last treatment

10   that you received?

11     A.    Yeah.  The EKG, yeah.

12     Q.    Okay.  And by the way, on May 1, 2019, when

13   you were seen by the medical professionals, were you

14   able to answer all of their questions?

15     A.    They didn't ask me no questions.

16     Q.    Okay.  On May 1, 2019, were you capable of

17   communicating with the medical professionals?

18     A.    Yeah.

19     Q.    Okay.  Do you remember anything that you said

20   to Defendant Espino in the two or three minutes that he

21   was with you?

22     A.    No.  I ain't say nothing to him.

23     Q.    Okay.  Do you remember anything that

24   Defendant Espino said to you on May 1, 2019?

25     A.    He ain't say nothing to me.

Executive Reporting Service

Page 34

1      Q.   All right.  Do you remember anything that any

2   of the nurses said to you on May 1, 2019?

3      A.   Not directly to me.

4      Q.   Okay.  What do you remember the nurses saying

5   on May 1, 2019?

6      A.   She was talking to the black nurse, and the

7   black nurse was logging stuff down.  She was writing

8   stuff down.

9      Q.   All right.

10     A.   Yeah.

11     Q.   Do you remember anything that any of the

12  nurses said on May 1, 2019?

13     A.   No.

14     Q.   All right.  Do you remember anything that you

15  said to any of the nurses on May 1, 2019?

16     A.   Not the nurses.  I said something to the

17  mental health director.

18     Q.   What did you say to him?

19     A.   He asked me, "Do you need to see mental

20  health?"

21          And I said, "Yes."

22          He said, "Talk."

23          I said, "In here?  In front of everybody?"

24          The lieutenant jumped in and he said --

25  Lieutenant Sanders said, "You're a threat."  That froze

Executive Reporting Service

Page 35

 1    me up right there.  I ain't say nothing else.  I ain't

 2    say nothing else.

 3         Q.    Was that before or after Defendant Espino

 4    examined you?

 5         A.    It was after, after he left out of the room.

 6         Q.    Okay.  And were the nurses still there?

 7         A.    Yes.

 8         Q.    Okay.  And just so I understand it, did the

 9    nurses examine you before Dr. Espino arrived?

10         A.    No.

11         Q.    All right.  I think I'm almost done.  Can you

12    give me like two or three minutes to go through my

13    notes and then I may have just a few more questions for

14    you?

15         A.    Yeah.

16         Q.    All right.

17              (Brief recess)

18    BY MR. HATTAWAY:

19         Q.    Okay.  I think I have just a few more

20    questions for you.

21              Do you know how to make a sick call request?

22         A.    Yes.

23         Q.    All right.  Okay.  So tell me how that works.

24         A.    You get you a form.  It's a sick call form,

25    and you got to fill it out with your name, DC number,

Electronically signed by Heidi Fabrikant (401-362-739-5523)                              562002da-4fd9-429d-9246-41fa727f0b9f

Page 36

1        housing location, explain your illness and the symptoms

2        and how long it's been occurring.  That's it.

3            Q.    And have you done that before?

4            A.    Yes.

5            Q.    All right.  And who do you get the form from?

6            A.    Officer Kurth.

7            Q.    All right.  And then who do you return the

8        form to after you've completed it?

9            A.    Medical.

10               MR. HATTAWAY:  All right.  Okay.  Sir, I

11            don't think I have any other questions for you.  I

12            don't know if the other lawyer has any questions

13            she wants to ask you, though.

14               THE DEPONENT:  What other lawyer?

15               MS. IZMAYLOVA:  No questions from me.  This

16            is Eugenia Izmaylova also on the line.  I represent

17            the FDOC defendants, but I don't have any

18            questions.

19               THE DEPONENT:  Oh, okay.

20               MR. HATTAWAY:  All right.  Mr. Knight, those

21            are all of the question I have for you.  I

22            appreciate your time, and I hope you have a good

23            rest of your day.

24               THE DEPONENT:  Can I get a copy of this?  You

25            hear me?

Electronically signed by Heidi Fabrikant (401-362-739-5523)                                                562002da-4fd9-429d-9246-41fa727f0b9f

Page 37

1          MR. HATTAWAY:  Yeah, I heard you.  I think

2     you would have to order it.  I don't exactly know

3     how that works, to be honest with you.

4          At this time, I don't know if we are ordering

5     it.  I will have to let you know, Madam Court

6     Reporter.  I suspect we will, but someone else from

7     my office will reach out and let you know.

8          THE REPORTER:  Okay.  That's fine.  Thank

9     you.

10          MR. HATTAWAY:  Have a good day, everyone.

11          MS. IZMAYLOVA:  Bye.  Thank you.  Take care.

12          (Deposition concluded at 10:54 a.m.)

13                    - - -

14

15

16

17

18

19

20

21

22

23

24

25

Executive Reporting Service

Electronically signed by Heidi Fabrikant (401-362-739-5523)                    562002da-4fd9-429d-9246-41fa727f0b9f

# CERTIFICATE OF NOTARY PUBLIC

STATE OF __FLORIDA__ )

COUNTY OF __Jackson__ )

I, _Amy Glisson_, Notary Public for the State of __FLORIDA__,

DO HEREBY CERTIFY That __Paul E. Knight, DC#063422__

personally appeared before me in the matter of __3:19-cv-00779-BJD-JBT/Paul E. Knight__

__v. Keegan Gray, et.al.__ at Apalachee Correctional Institution and was duly

sworn by me to tell the truth on the __21th__ day of __January__, __2021__.

WITNESS MY HAND AND SEAL in the City of__Sneads__, County

of__Jackson__, State of __FLORIDA__, this 21th day Jan, 2021

_Amy Glisson_
_Amy Glisson_

Notary Public State of Florida
Amy Glisson
My Commission GG 212259
Expires 04/29/2022

Notary Name printed & signature

Notary Public, State of __FLORIDA__

My Commission Expires: _04-29-2022_

Commission Number: _GG-212259_

Notary Phone Number: _850-593-9532_

Notary Email: _Amy.Glisson@fdc.myflorida.com_

Notary Address: _35 Apalachee Dr._
_Sneads, FL 32460_

Page 39

1                      CERTIFICATE OF COURT REPORTER

2          STATE OF FLORIDA)

3          COUNTY OF PASCO )

4

5                   I, Heidi Fabrikant, Florida Professional

6          Reporter, certify that I was authorized to and did

7          stenographically report the deposition of PAUL EMMANUEL

8          KNIGHT via teleconference; that a review of the

9          transcript was requested; and that the transcript,

10         pages 1 through 38, is a true and correct record of my

11         stenographic notes.

12                  I FURTHER CERTIFY that I am not a relative,

13         employee, attorney or counsel of the parties, nor am I

14         a relative or employee of any of the parties' attorneys

15         or counsel connected with the action, nor am I

16         financially interested in the action.

17

18                  DATED this 5th day of February, 2021.

19

20

21                          _____

22                          Heidi Fabrikant, FPR

23

24

25

Executive Reporting Service

Page 40

1               E R R A T A   S H E E T

2         DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES

3    IN RE:  Paul Emmanuel Knight v Keegan M. Gray, et al.

4               PAUL EMMANUEL KNIGHT
                   January 21, 2021
5

6    PAGE      LINE          READS AND SHOULD READ

7     5         2            8-27-1958/ 9-22-1958

8     5         5            APALACH: cold/ APALACHEE L.I.

9     5         6      LAST WORD, APALCHICOLA? APALACHEE, L.I.

10    5         9      LAST WORD: APALACHICOLA? APALACHEE L.I.

      15        3      BEHIND MY BACK, SHE/ HE SAID THE CUFFS
11                     CAME DOWN AND PINCHED INTO THE NERVES

12    15        6/7    HE GAVE ME DOUBLE CUFF PASS IN BACK/
                       DOUBLE CUFF PASS IN BACK.
13    15        8/9    THEY HAD TO PULL MY SHOULDERS/ PULL MY ARMS
                       TOGETHER TO CUFF ME UP/ PUTTING CUFFS ON ME/
14    15        10     — DOUBLE CUFFS PASS/ DOUBLE CUFF PASS.

15    17        18/19  BECAUSE THE X-RAYS SHOWED THE DAMAGE/
                       THE X-RAYS SHOWS MY BONE STRUCTURE DAMAGE
16                     AND/OR NERVE DAMAGE.

17    25        3      To him/ To her.
      36        6      — OFFICER KURTI/ THE OFFICERS.

18        Under penalties of perjury, I declare that I have

19   read the foregoing document and that the facts stated

20   in it are true.

21

22   2-21-2021                        Paul Knight
          Date                    Paul Emmanuel Knight
23

24

25

Executive Reporting Service

Page 41

1                  Executive Reporting Service
                      Ulmerton Business Center
2              13555 Automobile Blvd., Suite 100
                     Clearwater, Florida  33762
3                        (727)823-4155

4                     February 5, 2021

5   Paul Emmanuel Knight       DC#063422      PROVIDED TO APALACHEE
    c/o Apalachicola Prison                   CORRECTIONAL INSTITUTION
6   52 West Unit Drive                        ON _____
    Sneads, Florida  32460                      FOR MAILING
7
    RE:  Paul Emmanuel Knight v Keegan M. Gray, et al.
8   CASE NO.: 3:19-cv-779-J-39JBT

9   Dear Mr. Knight:

10       Your deposition taken on Thursday, January
    21, 2021, in the above-styled case, is ready for
11  review.  Please review the transcript and note any
    corrections on the errata sheet provided.
12
         You need to respond within a reasonable amount of
13  time from receipt of this notice or prior to any trial
    or final hearing date and the errata sheet returned to:
14  Executive Reporting Service, 13555 Automobile Blvd.,
    Suite 100, Clearwater, Florida  33762, so it may be
15  included with the original transcript.

16       Please contact our office if there are any
    questions you may have.  Thank you for your prompt and
17  careful attention to this matter.

18                     Sincerely,

19

20

21                     Executive Reporting Service
                       production@executivereporting.com
22

23
    cc:  Chase Hattaway, Esquire
24       Eugenia Izmaylova, Esquire

25

                  Executive Reporting Service