## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

PAUL EMMANUEL KNIGHT,

        Plaintiff,

v.                                                    Case No. 3:19-cv-779-BJD-JBT

KEEGAN M. GRAY, et al.,

        Defendants.

_____

## **ORDER**

## I. **Status**

Plaintiff, Paul Emmanuel Knight, an inmate of the Florida penal system, is proceeding under 42 U.S.C. § 1983 on a Second Amended Complaint (Doc. 12) against eight Defendants: (1) Sergeant Keegan M. Gray; (2) Officer Matthew Kurth; (3) Sergeant Austin Merritt; (4) Sergeant Brett Gillespie; (5) Officer Jack VanAllen; (6) Lieutenant Martin C. Sanders; (7) Officer Joel Econom; and (8) Dr. G. Espino. Plaintiff asserts Defendants committed a series of constitutional violations through uses of force and deliberate misconduct.

Before the Court are these motions: (1) Plaintiff's Motion for Summary Judgment (Doc. 78), with exhibits (Doc. 79); (2) Florida Department of Corrections (FDOC) Defendants Gray, Kurth, Merritt, Gillespie, Sanders, Econom, and VanAllen's Motion for Summary Judgment (Doc. 93), with

exhibits (Docs. 93-1 through 93-23)[1]; (3) Defendant Espino's Motion for Summary Judgment (Doc. 95), with exhibits (Docs. 96, 97, 97-1), as well as Espino's Renewed/Supplemental Motion for Summary Judgment (Doc. 146); and (4) Plaintiff's construed motion to amend (Doc. 144), and Plaintiff's construed motion for preliminary injunction (Doc. 145).

Defendants responded to Plaintiff's Motion for Summary Judgment (Docs. 113, 114), and Plaintiff replied (Docs. 120, 121). Plaintiff responded to FDOC Defendants' Motion for Summary Judgment (Doc. 109), with exhibits (Docs. 109-1, 109-2). Plaintiff also responded to Espino's Motion for Summary Judgment (Doc. 104) and Renewed/Supplemental Motion for Summary Judgment (Doc. 147). Espino replied (Doc. 106); Plaintiff filed a rebuttal (Doc. 111); and Espino filed a sur-reply (Doc. 112). These motions are ripe for review.

## II. <u>Plaintiff's Second Amended Complaint</u>

Plaintiff's allegations are difficult to comprehend. He seems to allege that on May 1, 2019, while housed at Florida State Prison, an officer, who is not a party to this case, would not let Plaintiff seal his legal mail, so Plaintiff called a sergeant, who also is not a party to this case, to help him with his "access to the court." Doc. 12 at 6. The sergeant, however, "condoned" the officer's conduct and told Plaintiff he would receive a disciplinary report for

---

[1] Defendant VanAllen filed a notice of joining FDOC Defendants' Motion (Doc. 122), which the Court accepted (Doc. 127).

yelling. *Id.* Later, Defendant Sanders approached Plaintiff's cell and ordered him to stop his disruptive behavior and "cuff up to be placed on property restriction," but Plaintiff "refused." *Id.* Defendants Econom and Gillespie, acting on Sanders's orders, then used chemical agents on Plaintiff "arbitrarily when [he] was no threat to security" or other staff. *Id.* at 6, 7 (claiming that Sanders, Gillespie, and Econom used excessive force by administering "(3) canisters or burst[s]" of chemical agents on Plaintiff), 13, 14. According to Plaintiff, Gillespie administered the chemical agents as Econom positioned himself cell front during the use of force. *Id.* at 10.

Plaintiff contends that after the chemical agents were administered, a cell extraction team consisting of Defendants Gray, Merritt, Kurth, and VanAllen was assembled. *Id.* at 8, 14. Plaintiff states that Gray, Merritt, Kurth, and VanAllen, on the orders of Sanders, used unnecessary and excessive physical force on him in his cell, while Sanders, Gillespie, and Econom failed to intervene. *Id.* at 9, 13-14. According to Plaintiff, the cell extraction team entered his cell and knocked him to the floor even though he was not resisting, and they repeatedly beat him for ignoring Sanders's order to submit to handcuffs. *Id.* at 8. Plaintiff alleges Defendants' use of force caused swelling in his eyes, face, hands, fingers, and left foot; a broken pinky toe; lacerations all over his head and face; and bleeding from the back of his head.

*Id.* at 13. He also asserts he continues to suffer from nerve damage in his hands and fingers as well as anxiety and depression. *Id.*

Plaintiff claims that after the cell extraction, Defendants took him to B-Wing for a decontamination shower, and during the shower, Gillespie, Gray, Merritt, Kurth, and VanAllen continued to abuse him "under a homosexual context." *Id.* at 14; *see id.* at 7. He claims that Sanders and Gillespie "watched . . . and refused to intervene" during the "contact or penetration of the anus . . . however slight in tampering with [his] buttocks." *Id.* at 14. But he also claims that Gillespie "actively participated in the homosexual abuse of illegal force in B-Wing shower." *Id.* Additionally, according to Plaintiff, Sanders "ordered [and] condoned the . . . homosexual abuse in B-wing shower" as Plaintiff was in handcuffs and leg restraints *Id.* at 13.

Plaintiff claims that following his decontamination shower, he was taken to medical and Defendant Espino examined his eyes, which were swollen and "the right one was bleeding from the excessive beating." *Id.* at 9. Plaintiff alleges that Espino was deliberately indifferent to his pain and suffering and Espino "walked out of the ex[]am room" and stated, "'that was the end of [the] treatment.'" *Id.*; *see also id.* at 10-11 (Plaintiff acknowledging that Espino examined his eyes and claiming that "it is a common practice policy of the Doctor [and] medical staff in general to not treat black inmates in particular [and] inmates in general of a cell extraction"). Plaintiff alleges that Espino did

not treat his "bleeding right eye, the bleeding in the back of [his] head, fingers, and hands with nerve[] damage, broken little toe on [his] left foot, [which is] disfigured [and] deformed for life, [causing] constant pain." *Id.* at 11. According to Plaintiff, Espino documented none of these injuries. *Id.* Plaintiff also contends his injuries were so noticeably serious that "Sanders told [Espino] [that Plaintiff] need[ed] to be examined all over," but Espino still did not provide treatment. *Id.* at 9. Plaintiff admits that a nurse placed a band-aid on his nose and another nurse put something on his right eye, while another nurse was logging his injuries.[2] *Id.* Plaintiff also recognizes that on August 26, 2019, Espino responded to Plaintiff's sick-call request and examined Plaintiff, during which Espino advised Plaintiff's x-rays were normal. *Id.* According to Plaintiff, however, during his September 2, 2019, sick call, a nurse, after examining Plaintiff's little toe and x-ray, advised she "'thinks' it's broken." *Id.* at 11.

Based on these allegations, the Court construes Plaintiff's Second Amended Complaint as raising several constitutional claims, with the following Eighth Amendment claims remaining[3]: use of excessive force as to the use of chemical agents (Sanders, Gillespie, and Econom); use of excessive physical force during the cell extraction (Gray, Merritt, Kurth, and VanAllen)

---

[2] Plaintiff's allegations could be construed as two or three nurses being present.

[3] The Court dismissed without prejudice Plaintiff's due process claims about a deprivation of property, access to courts claims, all conspiracy claims, and his request for declaratory relief. *See* Doc. 65.

and the failure to intervene therein (Sanders, Gillespie, and Econom); sexual abuse and failure to intervene therein (Sanders, Gray, Merritt, Kurth, VanAllen, and Gillespie); and deliberate indifference to Plaintiff's serious medical needs (Espino). As relief, Plaintiff requests compensatory and punitive damages. *Id.* at 15.

## III. Cross Motions for Summary Judgment

### A. Standard of Review

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Est. of Kesinger v. Herrington*, 381 F.3d 1243, 1247

6

(11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material <u>negating</u> the opponent's claim,' *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), in order to discharge this initial responsibility." *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.*

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

*Anderson*, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In cases involving video evidence, the Court will accept the video's depiction of the events if the video "obviously contradicts" the opposing party's version of events. *See Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010); *see also Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (recognizing that "where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible"). "But where the recording does not clearly depict an event or action, and there is evidence going both ways on it, we take the [the non-movant's] version of what happened." *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).

"The principles governing summary judgment do not change when the parties file cross-motions for summary judgment. When faced with

cross-motions, the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." *T-Mobile S. LLC v. City of Jacksonville, Fla.*, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). The Court must evaluate each motion separately to determine whether either party is entitled to the relief sought in their respective motions. In accordance with Rule 56, when evaluating the merits of each motion, the court must construe the facts in the light most favorable to the non-moving party. *See* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2720 (4th ed. 2018) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.").

## IV. <u>Analysis</u>

### A. FDOC Defendants' Motion

In their Motion, Defendants Gray, Kurth, Merritt, Gillespie, Sanders, Econom, and VanAllen argue they are entitled to summary judgment because: (1) Plaintiff has not established a constitutional violation against Defendants; (2) Plaintiff's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994); and (3) Defendants are entitled to qualified immunity.[4] *See generally* Doc. 93. In

---

[4] Because the Court finds no constitutional violations occurred, the Court need not address Defendants' *Heck* or qualified immunity arguments.

support of their Motion, Defendants submitted several exhibits. *See* Docs. 93-1 through 93-23. The Court summarizes the relevant evidence.

In his affidavit, Defendant Sanders described his participation and interactions with Plaintiff during the events.

> On May 1, 2019, I was on duty as a supervising officer at Florida State Prison. Organized Chemical and Physical Force was utilized on Inmate Paul Knight, due to his physical resistance to lawful commands and to quell the disturbance he was creating on E-wing. At approximately 12:00 p.m., Sgt. Ramon Nazario contacted me and advised that while he was escorting Assistant Warden James Taylor ("AW Taylor") during Duty Warden Rounds, Inmate Knight was observed yelling out of the bottom of the cell door and was ordered to cease his disruptive behavior to which he complied. I arrived in front of cell E1222s, which solely housed Inmate Knight.
>
> Inmate Knight's custody level is close management, which is assigned to inmates who are required to be housed separately from the general population due to their behavior. The front of the cell is approximately 4 feet in width and widens to approximately 6 feet. The cell has a total length of approximately 10 feet, for an approximate 66 square feet. There is a metal sink, metal shelf, metal bunk, metal footlocker, metal toilet, metal towel rack and metal writing table inside the cell.
>
> Inside the cell, I observed Inmate Knight with his bed not made, that he was not properly dressed in a class A uniform and that he had his personal property scattered throughout the cell floor. I ordered Inmate Knight to make his bed, to get dressed, and to clean his cell, to no avail.

I proceeded to the second floor of E-wing where I conducted a review of Inmate Knight's Form DC4-650b (Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Device) and conferred with Emergency Medical Technician C. Danley, both revealing that he had no known medical conditions that would be exacerbated by the use of chemical agents. I received authorization from AW Taylor to have Inmate Knight placed on 72-hour property restriction, to issue him a standing order for disorderly conduct and to use chemical agents if necessary, to obtain compliance. I returned cell front of El222s where Sgt. Nazario advised me that while I was away, Inmate Knight had smeared feces on his front cell window and was threatening to throw feces at staff. Camera Operator Officer James Gerow then began filming and I gave an opening statement to the camera identifying myself and describing the events that had occurred. Mental Health Specialist Adam Dalhman was present and spoke with Inmate Knight using crisis intervention techniques in an attempt to gain his compliance, but was unsuccessful.

At approximately 1:36 p.m., I issued Inmate Knight a final order to remove the feces from his window, to cease his disruptive behavior and to submit to handcuffing procedures to be placed on property restriction. I further advised him that failure to comply with either order would result in the use of chemical agents; and Inmate Knight once again refused to comply. At this time, I ordered for Sgt. Brett Gillespie and Correctional Officer Joel Econom to dress in PPE Gear and to assemble in front of cell E 1222s.

Officer Econom used the cell extraction protection shield to block the cell door opening and Sgt. Gillespie attempted to administer an application of chemical agent into the cell. However, Sgt. Gillespie was unable to complete the administration because Inmate Knight threw feces out of the handcuffing port striking Sgt.

11

Gillespie and CO Econom in the lower torso area and striking me in the upper torso area. Inmate Knight stated: "you gone eat that shit cracker."

I subsequently ordered CO Econom and Sgt. Gillespie to retrieve the rolling protection shield. At approximately 1:51 p.m., I used the chemical agent assist chain to open the door approximately 3 inches, CO Econom used the rolling protective shield to block the cell door opening and Sgt. Gillespie then administered one application of OC chemical agent into the cell but did not strike Inmate Knight. After the allotted time, I ordered Inmate Knight to submit to handcuffs to receive a cool water decontamination shower and to be placed on 72-hour property restriction, which he refused.

At approximately 1:59 p.m., I again used the chain to open the cell door a few inches, CO Econom blocked the cell door opening with the protective shield and Sgt. Gillespie administered a second application of OC chemical agent into the cell. After waiting the allotted time under FDOC regulations, I once again ordered Inmate Knight to submit to handcuffs to receive a decontamination shower and to be placed [on] property restriction, which he once again refused. I then contacted AW Taylor and advised him that Inmate Knight remained noncompliant after two applications of OC chemical agent. Mr. Taylor authorized for CS chemical agent to be used to bring Inmate Knight into compliance.

At approximately 2:06 p.m., I used the chain to open the cell door a few inches, and while CO Econom blocked the opening of the cell door with the protective shield, [ ] Sgt. Gillespie completed a third chemical agent administration, which consisted of the CS chemical agent into the cell. Inmate Knight still refused to comply with my order.

At this time, AW Taylor authorized for the Cell Extraction Team to be used if necessary to remove Inmate Knight from the cell. It was necessary to remove Inmate Knight from his cell for the protection of his health due to the application of the chemical agents and the unsanitary condition of the cell. I contacted the control room and ordered for the Cell Extraction Team (the "Team") to dress in PPE and Cell Extraction Gear and assemble in front of the cell. The Team arrived on the wing and introduced themselves to the camera operator as follows: 1) Sgt. Keegan Gray, 2) Officer Jack VanAllen, 3) Sgt. Austin Merritt, 4) Sgt. Brett Gillespie, and 5) Sgt. Matthew Kurth. I ordered the Team to use the minimum amount of force necessary to bring Inmate Knight into compliance with my orders.

I then issued a final order for Inmate Knight to submit to handcuffs to receive a decontamination shower and be placed [on] property restriction and advised him that failure to comply would result in the Team removing him from his cell. Once again, Inmate Knight refused to comply. I then breached the cell door, but the door jammed on a panel on the wall outside of the cell and I was only able to open the door about 9-10 inches. Inmate Knight was standing on top of his footlocker and threw a Styrofoam cup of feces, striking most of the officers on the Team. At approximately 2:27 p.m., the Team entered the cell. The Team restrained Inmate Knight with hand and leg restraints. Once the restraints were applied, Inmate Knight was assisted to his feet and escorted out of the cell. I did not observe any officers on the Team beating or hitting Inmate Knight or using any more force than was necessary to bring him into compliance. If I had observed anyone using an inappropriate amount of force on Inmate Knight, I would have intervened as a superior officer, documented, and reported that action.

Inmate Knight was then escorted to the B-wing second floor shower for decontamination from the chemical spray. Inmate Knight had several layers of clothes on. Plaintiff had feces and chemical agents on his clothes and body and refused to shower himself. The officers then told Plaintiff that he would need to be rinsed down with the hose, this procedure is known as a forced decontamination shower. Inmate Knight was wearing multiple layers of clothing. Based on my experience as a corrections officer, I believe he had intentionally put on several layers of clothing to pad himself for a forthcoming physical encounter with officers. Captain Lola utilized medical sheers to remove the first layer of clothing. Once the first layer of clothing was removed, I ordered the leg restraints to be removed so the rest [of] Inmate Knight's clothing could be removed, leaving him in a pair of boxers. I then ordered Sgts[.] Merritt, Kurth and Gillespie to conduct a decontamination shower. Sergeants Merritt and Kurth acquired a custodial grasp of Inmate Knight and Sgt. Gillespie used the high-volume low-pressure hose to run cool water over Inmate Knight's body for approximately three minutes, as required by FDOC procedures. Inmate Knight had feces and chemicals covering his entire body, including on his face and in his hair. I recall telling Inmate Knight to turn around so that Sgt. Gillespie could thoroughly rinse him off. Inmate Knight was agitated and spat in Sgt. Gillespie's direction. I jumped out of the way and ordered for a spit shield to be placed to prevent Inmate Knight from further spitting.

No physical force was used during the decontamination shower. I did not observe any officers slamming Inmate Knight's head into the wall, tampering with his buttocks or sexually abusing him during the shower. If I had observed any officers taking these types of actions, I would have intervened, documented, and reported it.[] After the shower concluded, Inmate Knight was issued a clean pair of

boxers and leg restraints were reapplied by Team Members.

After the decontamination shower, Inmate Knight was escorted to medical, where he received a post use of force physical by Dr. Espino. The following injuries [were] noted at the post use of force exam: R eye swollen, and Lacerations, L eye swollen, L side of nose has abrasion. Inmate Knight was instructed not to use any soaps or lotions for 72 hours as well as to remain in a seated or upright position for sixty minutes.

Inmate Knight was then escorted to B-wing and re-housed in cell B1319s, without further incident. I conducted a closing statement and all filming ceased. Inmate Knight was monitored by Officer Gerow for a total of 60 minutes with no signs of respiratory distress. Inmate Knight did not make any allegations of staff abuse or misconduct at that time. Following the incident, Inmate Knight received a total of 12 Disciplinary Reports. One for Disorderly Conduct, two for Disobeying a Verbal Order and nine for Battery or Attempted Battery on a Correctional Officer. See DR Log Nos 205-190915 through 205-190925, No. 205-191038, and No. 205-191039. I subsequently recommend[ed] that Inmate Knight be added to the heightened security list.

Doc. 93-16 (paragraph enumeration omitted). The written statements in Sanders's incident report are largely the same as the statements in his affidavit. *See* Doc. 93-2 at 1-4.

Assistant Warden James Taylor's first written report authorizing the use of force states Sanders contacted Taylor about Plaintiff causing a disturbance on his wing, refusing to get properly dressed, and scattering his mattress and personal items on his cell floor. Doc. 93-1 at 7. Taylor authorized placing

Plaintiff on a seventy-two-hour property restriction and the use of OC chemical agents if necessary to gain Plaintiff's compliance with lawful orders. *Id.* After Plaintiff refused to stop his disruptive behavior and submit to handcuffing procedures following two applications of OC chemical agents, Taylor authorized the use of CS chemical agents. *Id.* at 8. When Sanders advised Taylor that Plaintiff was still refusing to submit to handcuffing procedures after two applications of OC chemical agents and one application of CS chemical agents, Taylor authorized the use of a forced cell extraction team to bring Plaintiff into compliance with lawful orders. *Id.* at 9.

In his affidavit, Defendant Gillespie described his participation:

> On May 1, 2019, I was on duty at Florida State Prison and assigned to B-shift as the Internal Security Supervisor. I am trained in the administration of chemical agents. At approximately 1:38 p.m., Lieutenant Martin Sanders contacted me with an order to retrieve chemical agents, dress in PPE gear and assemble on E-wing. I arrived on E-wing and was advised that Inmate Paul Knight had refused a final order to cease disruptive behavior to submit to handcuffs to be placed on 72-hour property restriction. I was further advised that Inmate Knight had smeared feces on his front cell window [and] was threatening to throw it on staff. Office[r] Joel Econom was also present at the scene. When I opened the handcuffing port to Inmate Knight's cell (No. E1222s) in an attempt to administer chemical agent into the cell, Inmate Knight threw feces out of the handcuffing port and struck Officer Econom and I on our lower torso and blocked the cell opening with his blanket. Lieutenant Sanders then ordered Officer Econom and

16

I to retrieve the rolling protective shield and to return to the front of the cell, which we did.

After arriving back at the entrance to Inmate Knight's cell, Lt. Sanders used the chemical agent assist chain to open [the] cell door approximately 3 inches, Officer Econom used the rolling protection shield to block the cell door opening and at approximately 1:51 pm, I administered one application (138 grams) of three [] one-second bursts of OC chemical agent into the cell but did not strike Inmate Knight. Lieutenant Sanders then ordered Plaintiff to submit to handcuffs to receive a decontamination shower and be placed on property restriction, but Inmate Knight refused.

At approximately 1:59 p.m., Lt. Sanders again used the chemical agent assist chain to open the cell door approximately 3 inches, and while CO Econom blocked the opening of the cell door with the protection shield, I administered a second application, (157 grams) of 3 one-second bursts of OC chemical agent into the cell but did not strike the inmate. After the second OC application, Lt. Sanders gave another order for Inmate Knight to submit to handcuffing procedures to receive a decontamination shower and to be placed on property restriction, which he again refused.

At approximately 2:06 p.m., Lt. Sanders again opened the cell door a few inches, and while CO Econom blocked the opening of the cell door with the protection shield, I administered one application, (164 grams) of three one-second bursts, consisting of CS chemical agent into the cell but did not strike the Inmate. Lieutenant Sanders then once again ordered Inmate Knight to submit to handcuffs and once again Inmate Knight refused.

Lieutenant Sanders then ordered for the Cell Extraction Team (the "Team") to assemble and report to E-Wing. I exited the area, dressed in cell extraction gear and reported back to cell E1222s, and introduced

myself as Team Member #4 to the camera operator. Lieutenant Sanders ordered the Team to use the minimum amount of force necessary to bring Inmate Knight into compliance with his orders and then gave the Inmate a final order to submit to handcuffs and advised that failure to comply would result in the use of the Cell Extraction Team.

Lieutenant Sanders then breached the cell door; Inmate Knight threw a Styrofoam cup filled with feces which struck me and the other Team members. At approximately 2:27 p.m., I entered the cell with the other team members and Inmate Knight was pulled to the floor in the prone position by Team Members. Inmate Knight tucked both his arms and feet under his torso area, interlocked his fingers and began twisting and contorting his body in an attempt to defeat our physical direction. After a brief struggle, hand restraints were applied by other Team Members. Inmate Knight's legs were pulled from underneath him and held in place while I applied leg restraints. All force ceased at this time. I did not beat or abuse Inmate Knight or use any more force than was necessary to subdue him, nor did I observe anyone else doing so.

Inmate Knight was then assisted to his feet and escorted to the B-wing shower. Inmate Knight had several layers of clothing on. Captain Steven Lola used medical sheers to remove the first layer of clothing. Once the first layer of clothing was removed, Lt. Sanders ordered for leg restraints to be removed so the rest of Inmate Knight's clothes could be removed. Lieutenant Sanders ordered Sgts. Merritt, Kurth and I to conduct a decontamination shower. Sgts. Merritt and Kurth maintained a custodial grasp of the Inmate and I used the high-volume low-pressure hose to run cool water over Inmate Knight's body for approximately three minutes. No physical force was used during the decontamination shower. I did not use the nozzle of the hose to tamper with Inmate Knight's

18

> buttocks. The decontamination shower was a routine event carried out in accordance with FDOC procedures and there was no improper conduct towards Inmate Knight by any of the officers on the cell extraction team. The only unusual thing about the shower was that Inmate Knight did spit in my direction. After the shower concluded, Inmate Knight was issued a clean pair of boxers and his leg restraints were re-applied. A spit shield was applied to prevent battery on staff. Inmate Knight was then escorted to medical where he received a post use of force physical. Following the incident, I wrote 3 Disciplinary Reports due to Inmate Knight striking me with feces twice and spitting.

Doc. 93-20. Gillespie's incident report is largely identical to the statements in his affidavit. Doc. 93-2 at 1-3. After this incident, Gillespie issued three disciplinary reports against Plaintiff – (1) log # 205-190917 for battery or attempted battery on a correctional officer regarding Plaintiff throwing feces at Gillespie while trying to administer chemical agents (Doc. 93-7 at 22); (2) log # 205-190925 battery or attempted battery on a correctional officer for Plaintiff throwing a Styrofoam cup of feces out of his cell during the cell extraction (*id.* at 97); and (3) log # 205-191038 battery or attempted battery on a correctional officer for Plaintiff spitting at Gillespie during the decontamination shower (*id.* at 108).

In his affidavit, Defendant Econom described his participation in the incident:

> On May 1, 2019, I was assigned to B-Shift as the E-Wing Housing Officer at Florida State Prison. I was present on the second floor of E-Wing due to an

19

Organized Chemical Use of Force on Inmate Paul Knight (DC #063422). I was present in front of cell E 1222s. Lieutenant Martin Sanders breached the cell door and I used the cell extraction protection shield to block the cell door opening and Sgt. Brett Gillespie attempted to administer an application of chemical agent. Inmate Knight threw feces out of the handcuffing port and struck me and Sgt. Gillespie in the lower torso area. Lieutenant Sanders then ordered Sgt. Gillespie and I to retrieve the rolling-protective shield and to return cell front.

At approximately 1:51 p.m., Lt. Sanders used the chemical agent assist chain to open the door to Inmate Knight's cell several inches and while I blocked the cell door opening with the rolling protection shield, Sgt. Gillespie administered one application of OC chemical agent into the cell. Lieutenant Sanders then ordered inmate Knight to submit to handcuffing procedures to receive a decontamination shower and to be placed on 72-hour property, but he refused. At approximately 1:59 p.m., Sgt. Gillespie administered a second application of OC chemical agent into the cell. Lt. Sanders then repeated his instructions for Inmate Knight to submit to handcuffs to receive a decontamination shower and be placed on property restriction, and Inmate Knight refused again. At approximately 1:59 p.m., Sgt. Gillespie administered a third round of chemical agents into the cell, this time using the CS chemical agent. Inmate Knight subsequently refused another order from Lt. Sanders to submit to handcuffs for the decontamination shower and property restriction. Lieutenant Sanders then ordered for the Cell Extraction Team to assemble and report to the cell and at that time I exited the area. I subsequently wrote DR Log No. 205-190916 for battery on an officer due to Inmate Knight throwing feces out of his cell and striking me with it.

Doc. 93-21. Econom's statements in his incident report are largely the same as those made in his affidavit, except in his incident report, Econom adds "[n]o force was utilized by this writer." Doc. 93-2 at 14.

In his affidavit, Defendant Gray described his participation in the events:

> On May 1, 2019, I was on duty at Florida State Prison, assigned to B-shift as the F-wing Housing Supervisor with a secondary duty as a Cell Extraction Team Member. At approximately 2:10 p.m., I was activated as a Team Member of the Cell Extraction Team (the "Team"), advised to dress in PPE and cell extraction gear and to assemble on E-wing. I arrived on E-wing and was advised that two applications of OC and one application of CS had been used on Inmate Paul Knight (DC#063422) and that he had remained non-compliant with lawful orders.
>
> I introduced myself to the camera operator as Team Member #1 of the Team. The Team was instructed to use the minimal amount of force necessary to remove the inmate from the cell. I was advised that Inmate Knight had been throwing feces and had also made threats that "he was going to kill one of these crackers." The window of the cell was smeared with feces and we could not see into the cell or determine whether inmate Knight had any weapons. Before any Team Members entered the cell, Lt. Martin Sanders issued a Final Order for Inmate Knight to submit to handcuffs to receive a decontamination shower and be placed [on] property restriction and advised that failure to comply would result in the Team removing him from his cell. Inmate Knight refused to comply. Lieutenant Sanders then breached the cell door. At this time, Inmate Knight stood on top of his footlocker and threw feces out of the cell door opening, striking me in the upper torso area.

21

At approximately 2:27 p.m., I entered the cell with the cell extraction protection shield. Inmate Knight maintained his position on the footlocker and pushed the shield repeatedly causing me to drop it. I grasped Inmate Knight's left arm with both of my hands and with the assistance of other Team members we forced him to the floor in the prone position, inadvertently causing him to strike his head on the cell bunk and the cell floor on the way down. I relinquished my grasp of Inmate Knight's left arm and acquired a grasp of his upper torso area. Inmate Knight tucked both of his arms and his legs underneath his torso, interlocked his fingers and began twisting and contorting his body attempting to defeat our physical direction. I maintained my grasp of his upper torso area, held him in place and after a brief struggle, hand and leg restraints were applied. At this time, all force ceased. Inmate Knight was assisted to his feet and escorted to the B-wing, second floor shower, where he received a cool water decontamination shower and a clean pair of boxers. After the shower was completed, Inmate Knight was escorted to medical where he received a post use of force physical. Following the incident, I wrote DR Log. No. 205-190922 due to Inmate Knight striking me with feces.

Doc. 93-17. The statements Gray made in his incident report are the same as those in his affidavit. Doc. 93-2 at 5-6.

Defendant VanAllen described his conduct during the incident in his affidavit:

On May 1, 2019, I was on duty at Florida State Prison, assigned to B-shift as the H-wing Housing Officer with a secondary duty as a Cell Extraction Team Member. At approximately 2:10 p.m., I was activated [as] a Team Member of the Cell Extraction Team (the "Team"), advised to dress in PPE and cell extraction

22

gear and to assemble on E-wing. I arrived on E-wing and was advised that two applications of OC and one application of CS had been utilized on Inmate Paul Knight (DC#063422) and that he had remained non-compliant with lawful orders.

A camera operator began recording the events and I introduced myself to the camera as Team Member #2 of the Team. The Team was instructed to use the minimal amounts of force necessary to remove the inmate from the cell. Before any Team Members entered the cell, Lt. Martin Sanders issued a Final Order for Inmate Knight to submit to handcuffs to receive a decontamination shower and be placed [on] property restriction and advised him that failure to comply would result in the Team removing him from his cell. Inmate Knight refused to comply. Lieutenant Sanders then breached the cell door. At this time, Inmate Knight stood on top of his footlocker and threw feces out of the cell door opening, striking me and other Team Members. At approximately 2:27 p.m., I entered the cell. Inmate Knight was still standing on top of the footlocker and pushed on the cell extraction shield carried by another team member. I grasped Inmate Knight's left arm with my hand and with the help of other team members, Inmate Knight was pulled to the floor in the prone position. Inmate Knight struck his head on the cell bunk and the cell floor on the way down.

Once on the floor, Inmate Knight tucked both his arms and feet under his torso area, interlocked his fingers, and began twisting and contorting his body attempting to defeat our physical direction. I was able to apply hand restraints and after a brief struggle, leg restraints were also applied. All force ceased at this time. Inmate Knight was assisted to his feet and escorted to the B-wing, second-floor shower for decontamination. Inmate Knight was then escorted to medical and received a post use of force exam without further incident. Following the incident, I wrote DR

> Log No. 205-190920 due to Inmate Knight striking me with feces.

Doc. 122-1. VanAllen's written incident report contains the same statements as his affidavit. Doc. 93-2.

In his affidavit, Defendant Merritt described his participation in the cell extraction:

> On May 1, 2019, I was on duty at Florida State Prison assigned to B-shift as the L-wing Housing Supervisor with a secondary duty as a Cell Extraction Team Member. At approximately 2:10 p.m., I was activated as a Team Member of the Cell Extraction Team (the "Team"), advised to dress in PPE and cell extraction gear and to assemble on E-wing. I arrived on E-wing and was advised that three applications of chemical agents had been utilized on Inmate Paul Knight (DC#063422) and that he had remained non-compliant with lawful orders.
>
> I introduced myself to the camera operator as Team Member #3 of the Team and stated my responsibilities related to the cell extraction. The Team was instructed to use the minimal amount of force necessary to remove the inmate from the cell. I was advised that Inmate Knight had been throwing feces and had also made threats that "he was going to kill one of these crackers." The window of the cell was smeared with feces and we could not see into the cell or determine whether inmate Knight had any weapons. Before any Team Members entered the cell, Lt. Martin Sanders issued a Final Order for Inmate Knight to submit to handcuffs to receive a decontamination shower and be placed [on] property restriction and advised him that failure to comply would result in the Team removing him from his cell. Inmate Knight refused to comply. Lieutenant Sanders then breached the cell door.

At this time, Inmate Knight stood on top of his footlocker and threw feces out of the cell door opening, striking me and the other Team Members. At approximately 2:27 p.m., I entered the cell; Inmate Knight was still standing on top of the footlocker and pushed the cell extraction protection shield away from him. Inmate Knight was forced to the floor in the prone position and tucked both his arms and feet under his torso area, interlocked his fingers and began twisting and contorting his body in an attempt to defeat our physical direction. I grasped Inmate Knight's left arm with both my hands and pulled it behind his back. Inmate Knight's right arm was forced behind his back. I transitioned both my hands to inmate Knight's forearms, forced them together and held them in place until hand restraints were applied to both his wrists. After a brief struggle, leg restraints were applied and all force ceased at this time. I grasped Inmate Knight's right arm, assisted him to his feet and escorted him to the second floor of B-wing for a decontamination shower.

Inmate Knight was wearing several layers of clothing and Captain Lola used medical sheers to remove the first layer. His leg restraints were then removed so that the rest of his clothes could be removed as well. Lieutenant Sanders ordered Sgts. Gillespie, Kurth and I to conduct a decontamination shower. I maintained a custodial grasp of Inmate Knight's right arm while Sgt. Gillespie used the high-volume low-pressure hose to run cool water over Inmate Knight's body for approximately 3 minutes. Inmate Knight did not offer any physical resistance during the decontamination shower and no physical force was used. After the shower was completed, Inmate Knight received a clean pair of boxers and was escorted to medical where he received a post use of force physical. Following the incident, I wrote DR Log No. 205-190919 due to Inmate Knight striking me in the torso with feces.

Doc. 93-19. Merritt's written incident report contains the same statements as those in his affidavit. Doc. 93-2 at 9.

In his affidavit, Defendant Kurth also described his participation in the events:

> On May 1, 2019, I was on duty at Florida State Prison, assigned to B-shift as the L-wing Housing Supervisor with a secondary duty as a Cell Extraction Team Member. At approximately 2:10 p.m., I was activated [as] a Team Member of the Cell Extraction Team (the "Team"), advised to dress in PPE and cell extraction gear and to assemble on E-wing. I arrived on E-wing and was advised that two applications of OC and one application of CS had been utilized on Inmate Paul Knight (DC#063422) and that he had remained non-compliant with lawful orders.
>
> I introduced myself to the camera operator as Team Member #5 of the Team. The Team was instructed to use the minimal amount of force necessary to remove the inmate from the cell. I was advised that Inmate Knight had been throwing feces and had also made threats to Officer Econom that "he was going to kill one of these crackers." The window of the cell was smeared with feces and we could not see into the cell or determine whether inmate Knight had any weapons. Before any Team Members entered the cell, Lt. Martin Sanders issued a Final Order for Inmate Knight to submit to handcuffs to receive a decontamination shower and be placed [on] property restriction and advised him that failure to comply would result in the Team removing him from his cell. Inmate Knight refused to comply. Lieutenant Sanders then breached the cell door.
>
> At this time, Inmate Knight stood on top of his footlocker and threw feces out of the cell door opening, striking me and other Team Members. At

26

approximately 2:27 p.m., I entered the cell. Inmate Knight was pulled to the floor in the prone position. He then tucked both his arms and feet under his torso area, interlocked his fingers and began twisting and contorting his body attempting to defeat our physical direction. After a brief struggle, hand restraints were applied. Inmate Knight pulled his legs out from underneath his torso. I acquired a grasp of Inmate Knight's legs, forced them together and held them in place while leg restraints were applied. All force ceased at this time. I grasped Inmate Knight's left arm, assisted him to his feet and escorted him to the B-wing, second floor shower for decontamination. Inmate Knight was wearing several layers of clothing and Captain Lola used medical sheers to remove the first layer. His leg restraints were then removed so that the rest of his clothes could be removed as well. Lt. Sanders ordered Sgts. Gillespie, Merritt and I to conduct a decontamination shower. I grasped Inmate Knight's left arm while Sgt. Gillespie used the high-volume low-pressure hose to run cool water over his body for approximately 3 minutes. Inmate Knight was then escorted to medical and received a post use of force exam without further incident. Following the incident, I wrote DR Log No. 205-190921 due to Inmate Knight striking me in the torso with feces.

Doc. 93-18. The statements Kurth made in his written incident report are the same as those made in his affidavit. Doc. 93-2 at 11-12.

On July 18, 2019, Plaintiff submitted a complaint about an alleged sexual assault that occurred during the May 1, 2019, decontamination shower. Doc. 93-6. After investigating the matter, the FDOC Office of the Inspector General issued a "Complaint Review Report" containing the following summary:

Based on the information gathered during this Complaint Review, it is the recommendation[] of Inspector Steven Donaldson [that] this review should be closed. On July 18, 2019, Inmate Paul Knight DC# 063422 alleged improper [] sexual [conduct] during a use of force on May 1, 2019, at Florida State Prison. Inmate Knight alleged unnamed staff "tampering with my butt that shower on this wing[.]" Inmate Knight waited two months to make his allegations. Records indicate Inmate Knight refused to submit to restraint procedures after smearing his cell with his own feces. Inmate Knight threw feces on the correctional staff. Chemical agents were utilized and a decontamination shower was done. Inmate Knight was inside the shower for approximately three minutes. No mention of sexual penetration was said by Inmate Knight therefor[e] this [does] not meet the guidelines as sexual battery per FDC policy.

UOF# 19-07764 (MINS# 926206) was reviewed by Inspector Matthew Stutts and approved [and] closed by Lacy Ravin on July 31, 2019. . . . . No improper conduct / PREA was observed by the inspector.

The PREA allegation is not a PREA per the FDC guidelines as video disproved that allegation that was previously investigated by the Inspector General's Office.

Doc. 93-6 at 4. In sum, the Inspector General concluded that Plaintiff's allegations of sexual misconduct were "[u]nfounded." *Id.*

In her declaration, Kellie Caswell, a legal nurse consultant for the FDOC, states she is aware of Plaintiff's allegations about the May 1, 2019, excessive force and sexual abuse. Doc. 93-15. She explained she reviewed over

one-thousand pages of documents "to determine whether Plaintiff's allegations comport with the findings in his medical records." *Id.* at 1. Caswell stated:

> I [ ] created a chronology of Plaintiff's pertinent health care events, beginning on October 2, 2018 through July 9, 2020. My explanation and analysis of the medical evidence related to Plaintiff's allegations is below.
>
> **Allegation: Plaintiff alleges . . . "[his] eyes beaten closed, blood running from the right eye, swelling of [his] face, hands, finger, left foot, with a broken little toe, lacerations all over head and face, bleeding from the back of my head . . . ."**
> On 05/01/2019, Mr. Knight was brought to medical for two incidents. Both incidents are documented on the ER record and the Diagram of Injury. Mr. Knight was seen for a PUOF exam as well as alleged staff abuse.
>
> ER Record #1 [ ]: documents that the date and time of occurrence [w]as 05/01/2019 at 1352. The time of exam [wa]s 1448. Mr. Knight arrived to medical ambulatory, alert and oriented x 4, and respond[ed] to questions verbally. The description of occurrence states that Mr. Knight [was] being examined for a PUOF exam with chemical and physical. Mr. Knight's vital signs were normal with the exception of [a] slightly elevated heart rate and blood pressure. Mr. Knight's respirations were even and unlabored, skin was warm and dry, and no signs or symptoms of distress were noted during the assessment. There were no other injuries noted or voiced during the assessment. The exam summary states that Mr. Knight had a swollen right eye with lacerations. His left eye was swollen, and the left side of his nose had abrasions. The physician was notified, Mr. Knight's wounds were cleaned with normal saline, and Dermabond was applied to his right eye.

The Diagram of Injury [ ]: documents the date of occurrence [w]as 05/01/2019 at 1352. The date and time the injury was assessed was 05/01/19 at 1448. The description of injury [wa]s documented as a right eye swollen with laceration. Left eye swollen, nose, left side, abrasions.

ER Record #2 [ ]: documents the date and time of the occurrence [w]as 05/01/2019 at 1350. The date and time of exam was 07/18/2019 at 1550. The description of occurrence [wa]s: alleged staff abuse. Mr. Knight arrived to medical ambulatory, alert and oriented x 4, and respond[ed] to questions verbally. His vital signs were within a normal range with the exception of a very slight elevation in his blood pressure. Mr. Knight had complaints of pain to his bilateral hands, left elbow, left pinky toe, left foot, eyes, nose, and right index finger.

The exam summary documents that Mr. Knight was alert and oriented x 4, ambulatory with a steady gate. His breathing was even and unlabored and he was in no apparent distress. The clinician documented PERRLA (pupils equal round and reactive to light and accommodation) at 5mm. Mr. Knight complained of multiple injuries from PUOF 05/01/2019 (previously documented). Mr. Knight alleges he was "beat up by staff." All injuries today are documented on attached DC4-708 (Diagram of Injury). The physician was not notified, and no treatment was provided. A referral was made to Mental Health and a follow-up appointment was made with the physician. Mr. Knight was discharged to confinement.

The Diagram of Injury [ ]: documents the date of occurrence [w]as 05/01/2019 at 1350. The date injury was assessed by medical 07/18/2019 at 1550. There are 7 injuries documented. Please see descriptions below:

#1-Left pinky toe deformity – pain with palpation/limited ROM (range of motion)

#2-Right index finger – mild swelling, limited ROM
#3-Right thumb – pain with movement, no visible injuries
#4-Left thumb – pain with movement, no visible injuries
#5-pain "sharp" left elbow with pressure
#6-obvious scar to r. eye – documented on PUOF from 05/01/2019 – IM c/o blurred vision
#7-scar left side of nose – documented injury on PUOF from 05/01/2019

It is noted in my review of the above records that there were additional injuries (not documented on the 05/01/2019 incident) documented on the exam date of 07/18/2019.

X-rays [ ]: Mr. Knight had an x-ray of his right and left hands and left foot on 08/05/2019. The conclusion of the x-rays . . . [wa]s documented as:
• Right hand – Negative right hand – no fracture
• Left hand – Soft tissue swelling second finger no fracture
• Left foot – 5th proximal interphalangeal joint with possible fracture

Mr. Knight was seen by the medical doctor on 08/26/2019 [ ]. The MD reviewed the x-rays and documented that the exam of the foot and hand look normal with no signs of fracture. Mr. Knight asked to "tape it to the next toe." The MD taped the toes on the left foot and the right foot required no treatment.

Mr. Knight alleges on 05/01/2019 that his eyes were beaten closed. Please see the medical chronology and the notes above that document Mr. Knight had swollen eyes and the right eye had documented abrasions.

Mr. Knight alleges that he had blood running from the right eye. Please see the above notes that his right eye was documented to have abrasions, however, there is no documentation of bleeding during the assessment.

31

Mr. Knight alleges that he had swelling of his face. The documentation from the date of incident, 05/01/2019, does not indicate that his face was swollen, only his eyes.

Mr. Knight alleges that he had injuries to his hands, fingers, left foot (a broken little toe), lacerations all over the head and face, and bleeding from the back of his head. Please see the documentation above that the injuries to his hands, fingers, and left foot were not reported until 07/18/2019. These injuries were not noted on the original incident date of 05/01/2019. There was no indication in the documentation from 05/01/2019 or 07/18/2019 that Mr. Knight had lacerations all over his head and face or that he was bleeding from the back of his head.

**Allegation: [Plaintiff] alleges that he has nerve damage in his hands and fingers.**
Common signs and symptoms of nerve damage to the hands and fingers typically include the following[:] gradual onset of numbness and tingling in the hands and fingers, sharp pain that can be described as throbbing or burning, sensitivity to touch and muscle weakness. In the medical records I received and reviewed, as detailed below, there is no documentation of a diagnosis of nerve damage to Mr. Knight's hands or fingers.

Mr. Knight was assessed by medical on 07/23/2019 for complaints of pain to his fingers and left toe. [ ] The documentation state[d] that the pain doesn't radiate and there are no complaints of numbness or tingling to the affected areas.

Mr. Knight was assessed by medical on 08/02/2019 [ ]. He complained of pain to his left toe, right finger and left hand. The MD does not document that there is any indication of possible nerve damage.

Mr. Knight was seen by medical on 09/02/2019 [ ]. He complained of pain to his left 5th toe. Mr. Knight did not complain of numbness or tingling to the affected area.

Mr. Knight was seen by medical on 10/09/2019 [ ]. He complained of pain to his left fifth toe. Mr. Knight did not complain of numbness or tingling to the affected area. No swelling or deformity was noted during the assessment.

Mr. Knight complained of pain and numbness to his right hand, fingers, and whole right arm on 03/20/2020 [ ]. Mr. Knight was assessed by medical on 04/01/2020 [ ]. He complained of left shoulder pain, intermittent numbness. There was no swelling noted and Acetaminophen was given for pain.

Mr. Knight was seen by the ARNP on 04/09/2020 [ ]. Mr. Knight complained of right shoulder pain and was requesting a front cuff pass. It is documented that there was no swelling to his right shoulder. An x-ray was ordered for his shoulder and Motrin was given for pain. He was denied the front cuff pass due to not meeting the criteria.

Mr. Knight had an x-ray of his right elbow and right shoulder on 05/08/2020 [ ]. The results of the right shoulder and right elbow were negative – no fracture.

In addition, I reviewed a report generated by FDOC's Chief of Pharmacy Services documenting Mr. Knight's prescribed anxiety/depression medications. The report documented that Mr. Knight was prescribed fluoxetine (Prozac) which is classified as a selective serotonin reuptake inhibitor (SSRI) antidepressant starting on 02/11/2015. Mr. Knight has had this medication prescribed routinely, with the last date on the report being 01/26/2021.

Doc. 93-15 (paragraph enumeration omitted).

In his sworn deposition, Plaintiff testified that on the day of the incident, he became frustrated with two officers because they were mishandling his legal mail. Doc. 93-22 at 11-13. Plaintiff states he kicked his cell door and when one officer advised Plaintiff he was issuing Plaintiff a disciplinary report for kicking his door, Plaintiff "cussed him out." *Id.* at 13. According to Plaintiff, Defendant Sanders then approached Plaintiff's cell and told him he was being placed on property restriction. *Id.* Plaintiff testified that he became angry and as a "form of rebellion," he covered his cell window with his own feces. *Id.* at 14. Plaintiff explained that he knew covering his cell window was against institutional rules but stated he did it anyway hoping officers would "be disgusted and just go and turn away and leave [him] alone . . . ." *Id.* According to Plaintiff, officers did not issue any instructions to cuff up and exit his cell before using chemical agents. *Id.* at 15-16.

He testified that he was sitting on his bed when officers administered the first bursts of chemical agents and they did not ask that he come out of his cell before administering the other two bursts of chemical agents. *Id.* at 16-17. Plaintiff asserted officers instead "kept telling me to uncover my window . . . and I was ignoring them." *Id.* at 17. According to Plaintiff, after administering three uses of chemical agents, he was sitting on his bed when officers began to open his cell door with an extraction team. *Id.* at 18. Plaintiff testified that he had a cup of urine in his hand and when the officers saw the cup, they hesitated

34

because they thought it was feces. *Id.* at 18. He stated the officers then squeezed into his cell, forced him onto the ground, "put handcuffs on [him] and just went to beating [him] until [he] stopped resisting," and because he "wouldn't stop resisting, [ ] they continued to beat [him]." *Id.* at 18-19. According to Plaintiff, officers hit him "[a]ll over [his] head and the side of [his] face. They were trying to break [his] hands and [his] fingers. And one of them, when they put the cuffs on [his] feet, they popped [his] little toe." *Id.* at 19.

Plaintiff testified that after officers pulled him up from the floor, they took him to the shower and cut his clothes off before hosing him down with water. *Id.* at 20. He stated no one told him he needed a decontamination shower, he could not see where they were taking him because his "eyes were beat closed," and they did not take off his handcuffs or shackles during the shower. *Id.* at 20-22. He testified that while he was being hosed off, officers "stab[ed] [him] in [his] butt [and] slam[med] [his] head against the wall." *Id.* at 21. According to Plaintiff, Defendant Gillespie was the officer that "stabbed [him] in [his] butt with" the hose nozzle and he was only able to identify Gillespie as the individual who sexually assaulted him after Gillespie filed the disciplinary report accusing Plaintiff of spitting at him during the shower. *Id.* at 23-25. Plaintiff testified that he did not spit on anyone during the shower. *Id.* at 25.

35

According to Plaintiff, he never threw feces at any officers during the incident and only threw urine at the officers once, but the urine hit no one. *Id.* at 32. He testified that he received thirteen disciplinary reports for the incident, and he was found guilty of the charges following a hearing. *Id.* at 33. He states that two of those disciplinary reports – the ones issued by Kurth and VanAllen – were later overturned. *Id.*

Plaintiff stated that after the shower, officers took him to medical where "[t]he doctor looked at my right eye because it was bleeding and busted open and left the room." *Id.* at 26. He testified a nurse then put something on his eye that gave him a "stinging sensation" and officers then escorted him to a "stripped cell" while he was still bleeding. *Id.* at 27. According to Plaintiff, after May 1, 2019, another doctor ordered x-rays, and Defendant Espino advised Plaintiff that the x-rays of his toe and hand were normal even though Plaintiff was still in pain. *Id.* at 28. Plaintiff testified he has ongoing pain in his right hand, fingers, right arm, and shoulder. *Id.* at 29. He stated "[t]hey put [him] on some ibuprofen, 600 milligrams . . . with no refills." *Id.* Plaintiff also mentioned that on May 5 or 6, 2019, two other officers who are not defendants "beat" him, but he suffered no injuries during that assault. *Id.* at 31.

The handheld video evidence begins with Defendant Sanders addressing the camera and stating Plaintiff has been creating a disturbance on the wing, refusing to get dressed, and using a Styrofoam cup to collect and throw feces

36

at and under the door. Doc. 93-1 at 9. Sanders also explains that Plaintiff is refusing to submit to hand restraints or uncover his cell window, and all efforts to get Plaintiff to stop his disruptive behavior have been unsuccessful. The camera then shows the outside of Plaintiff's cell, and his cell window is covered in what seems to be brown feces, completely obstructing any view to inside his cell. A mental health counselor approaches Plaintiff's cell and asks Plaintiff to uncover his window and follow orders. Plaintiff does not respond. Sanders then addresses the camera and states he can hear Plaintiff inside his cell moving around and kicking his footlocker, but he is refusing to verbally respond to officers' inquiries.

Sanders walks away for about ten minutes before coming back and issuing a final verbal order for Plaintiff to uncover his cell window, stop his disruptive behavior, and submit to handcuffing procedures, so he can be placed on property restriction. Sanders also advises Plaintiff that his failure to comply would result in the use of chemical agents. Plaintiff does not respond or uncover his window. When he receives no response, Sanders walks away from the cell.

Sanders returns to Plaintiff's cell with Gillespie and Econom who are dressed in full PPE gear. Sanders again asks Plaintiff to uncover his cell window and submit to restraints because he is being placed on property restriction. Plaintiff responds by yelling profane and incoherent words.

37

Although their bodies obscure the camera's view of the cell door, Gillespie and Econom prepare to administer chemical agents through the cell door flap. But before they can administer the spray, a loud, jarring bang is heard from inside the cell, causing the three officers to jump backwards as Plaintiff yells, "eat that shit." Sanders, Gillespie, and Econom walk away from the cell and Sanders looks at the camera and states they are going to get more safety gear to cover their faces before proceeding.

Sanders, Gillespie, and Econom return with a large shield. Sanders then opens Plaintiff's cell door a few inches using the assist chain as Gillespie and Econom stand behind the large shield. Gillespie then reaches his arm under the shield and administers three one-second bursts of chemical agents into Plaintiff's cell and Econom holds the large shield steady. Plaintiff's cell door is closed and the officers walk away. A few minutes later, Sanders, Gillespie, and Econom return to Plaintiff's cell front and Sanders asks Plaintiff to submit to hand restraints, so he can be placed on property restriction and escorted to a decontamination shower. Plaintiff does not respond. Gillespie and Econom then open Plaintiff's cell door a few inches as they stand behind the large shield and Gillespie administers a second round of three one-second bursts of chemical agents into Plaintiff's cell. The officers close Plaintiff's cell door and walk away.

A few minutes later, Sanders, Gillespie, and Econom return. Sanders again asks Plaintiff to submit to hand restraints, so he can be placed on property restriction and receive a decontamination shower. Plaintiff does not respond. Gillespie and Econom then open Plaintiff's cell door as they stand behind the large shield and Gillespie administers a third round of one-second bursts of chemical agents into Plaintiff's cell. Plaintiff yells more profane and incoherent statements to the officers, who close Plaintiff's cell door and walk away.

A few minutes later, an officer moves the large shield away from Plaintiff's cell front, revealing what looks like a puddle of white and brown liquid on the ground under Plaintiff's cell door flap. Sanders returns to Plaintiff's cell door and again asks Plaintiff to uncover his cell window and submit to hand restraints to be placed on property restriction and receive a decontamination shower. Sanders also advises Plaintiff that failure to follow orders will result in an authorized use of organized force for a cell extraction. Plaintiff does not respond.

Another officer then addresses the camera and explains that Plaintiff's cell window remains covered in feces. He explains that three applications of chemical agents have been administered into Plaintiff's cell – two applications of an OC chemical agent and one application of a CS chemical agent – and because Plaintiff is still disregarding orders, Sanders has received

authorization for a cell extraction. A five-man cell extraction team is lined up behind the officer. The officer then talks to the team and advises them that because Plaintiff has been throwing feces and threatened that "he was going to kill one of these crackers," the team should use extreme caution and apply only the minimum amount of force necessary to restrain Plaintiff. The cell extraction team then introduces themselves as (1) Gray, (2) VanAllen, (3) Merritt, (4) Gillespie, and (5) Kurth.

The cell extraction team assembles in front of Plaintiff's cell with Sanders at their side. Sanders again orders Plaintiff to uncover his window and submit to hand restraints. Plaintiff does not respond. The cell extraction team then lines up in front of the cell door. Sanders opens the cell door but the cell extraction team cannot enter because Plaintiff is seen standing on a raised surface right behind the door and throwing a cup containing a liquid substance at the cell extraction team, which strikes the members of the team. Plaintiff continues to stand on the raised surface as he physically resists the officers' entry.

About twenty seconds after the door is opened, one team member pushes his way into the cell and Plaintiff is no longer standing on the raised surface and is out of the camera's view. Three other members enter the cell while a fifth team member and Sanders stand outside Plaintiff's cell. Seven seconds after entry, the shield is removed from the cell. A physical struggle or

40

resistance between the four extraction team members and Plaintiff is seen, but because officers are blocking the camera's view and since the events are occurring in such a narrow cell, the Court cannot see the individual movements or actions of each officer or Plaintiff. No kicking or punching motions are visible. Plaintiff's cell is clearly covered in human waste and fluids. Officers yell at Plaintiff to stop resisting, order him to submit to leg restraints, and demand he "pull his hands apart." About three minutes after the cell extraction team enters, Plaintiff stands and two officers escort Plaintiff as he walks out of the cell in hand and leg restraints. Plaintiff's gait is normal, and some blood is visible on his face.

The two cell extraction team members escort Plaintiff to the decontamination shower. When they arrive at the shower, the two team members aide Plaintiff into a shower stall with no door and position him behind a privacy wall, out of the camera's view. The two team members who escorted Plaintiff remain in the shower area with Plaintiff and are also out of the camera's view. A third cell extraction team member then pulls around a large water hose and steps into the shower stall preparing to hose down Plaintiff. Another officer (not a team member) then gets into the shower stall and cuts off the many layers of clothing that Plaintiff is wearing because the clothing is covered in feces. Plaintiff's leg restraints are removed and handed to another officer standing outside the shower stall. The water is turned on and

an officer uses the hose to spray Plaintiff with water. Sanders stands outside the shower stall.

Because Plaintiff and the three team members are behind a wall, the Court cannot see the individual movements or actions of anyone during the decontamination shower. As he is being sprayed with water, Plaintiff makes incoherent screaming noises. Sanders speaks to Plaintiff and acknowledges that the water is cold, but states Plaintiff must take a decontamination shower. Two minutes into the shower, Sanders requests a spit shield as water or spit is seen projecting from the shower stall in Sanders's direction. Plaintiff continues to scream, yelling "Oh, God" and "Please, Please." Three minutes into the decontamination shower, the water is turned off and the hose is removed from the stall. Plaintiff is handed a pair of clean boxers and officers reapply Plaintiff's leg restraints. The two team members then help Plaintiff walk out of the shower stall. Plaintiff is wearing boxers and a spit shield.

The same two team members, along with a third team member in tow, walk Plaintiff to medical for a post use of force exam. They enter the exam room, Plaintiff sits on the exam table, and the exam room door is closed. At least two female nurses are already inside the exam room. About a minute after Plaintiff's arrival, Defendant Espino enters the exam room. Through the window, Espino is seen examining Plaintiff's face, eyes, and head. Two minutes later, Espino exits the exam room. Two female nurses then enter the exam

42

room. One female nurse approaches Plaintiff and begins treating Plaintiff's facial or head wounds, treating him for several minutes. When done, officers put the spit shield back on Plaintiff.

Fifteen minutes after entering the exam room, officers walk Plaintiff out of the room, escort him to a new cell, and remove his leg and hand restraints without incident. Sanders addresses the camera, stating Plaintiff is being placed on a seventy-two-hour property restriction. Sanders also states that Espino examined Plaintiff and noted a small laceration to his right eye and small laceration to the left side of his nose. Sanders also noted that Plaintiff made no allegations during the exam.

## 1. Chemical Agents

Plaintiff argues that Defendants Econom and Gillespie, following the orders of Defendant Sanders, arbitrarily administered three uses of chemical agents on Plaintiff when he was no threat to security or other staff, violating his rights under the Eighth Amendment. Doc. 12 at 6-7. Defendants argue they are entitled to summary judgment for the use of chemical agents because Sanders reasonably determined that chemical agents were necessary based on Plaintiff's repeated refusal to follow handcuffing and decontamination procedures; Defendants administered the force to restore order; and Defendants' application of three rounds of three one-second bursts of chemical

agents was proportionate to what the situation required and complied with institutional rules. Doc. 93 at 14-18.[5]

"In considering an Eighth Amendment excessive force claim, [the Court] must consider both a subjective and objective component: (1) whether the 'officials act[ed] with a sufficiently culpable state of mind,' and (2) 'if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation.'" *Tate v. Rockford*, 497 F. App'x 921, 923 (11th Cir. 2012) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).[6]

> In both Fourteenth and Eighth Amendment excessive force claims, whether the use of force violates an inmate's constitutional rights "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)) (establishing the standard for an Eighth Amendment excessive force claim); *see Bozeman v. Orum*, 422 F.3d

---

[5] In his Response to the FDOC's Motion, Plaintiff asserts Defendants did not provide him with an opportunity to watch the handheld video evidence during discovery. Doc. 109 at 8. After the FDOC Defendants filed their Motion, the Court noticed Defendants failed to file, under seal, the handheld video evidence on which they heavily rely, and thus issued an Order directing FDOC Defendants to file the correct video evidence and coordinate with the classification officers at Plaintiff's institution and arrange for Plaintiff to review the handheld video evidence. Doc. 127. FDOC Defendants complied with the Court's Order and filed a notice advising that Plaintiff reviewed the handheld video evidence. Doc. 131.

[6] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. *See McNamara v. GEICO*, 30 F.4th 1055, 1060-61 (11th Cir. 2022); *see generally* Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

> 1265, 1271 (11th Cir. 2005) (applying the *Whitley* test
> in a Fourteenth Amendment excessive force case). If
> force is used "maliciously and sadistically for the very
> purpose of causing harm," then it necessarily shocks
> the conscience. *See Brown v. Smith*, 813 F.2d 1187,
> 1188 (11th Cir. 1987) (stating that the Eighth and
> Fourteenth Amendments give equivalent protections
> against excessive force). If not, then it does not.

*Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007). The standard in a use

of excessive force case is as follows:

> [O]ur core inquiry is "whether force was applied
> in a good-faith effort to maintain or restore discipline,
> or maliciously and sadistically to cause harm." *Hudson
> v. McMillian*, 503 U.S. 1, 112 In determining whether
> force was applied maliciously and sadistically, we look
> to five factors: "(1) the extent of injury; (2) the need for
> application of force; (3) the relationship between that
> need and the amount of force used; (4) any efforts
> made to temper the severity of a forceful response; and
> (5) the extent of the threat to the safety of staff and
> inmates[, as reasonably perceived by the responsible
> officials on the basis of facts known to them]. . . ."
> *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir.
> 1999) (quotations omitted). However, "[t]he Eighth
> Amendment's prohibition of cruel and unusual
> punishments necessarily excludes from constitutional
> recognition *de minimis* uses of physical force, provided
> that the use of force is not of a sort repugnant to the
> conscience of mankind." *Hudson*, 112 S. Ct. at 1000
> (quotations omitted).

*McKinney v. Sheriff,* 520 F. App'x 903, 905 (11th Cir. 2013). "Although the

extent of the injury is a relevant factor in determining the amount of force

applied, it is not solely determinative of an Eighth Amendment claim."

45

*Muhammad v. Sapp*, 494 F. App'x 953, 957 (11th Cir. 2012) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)).

> When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. *See Whitley*, *supra*, 475 U.S. at 327. This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

*Hudson*, 503 U.S. at 9.

The Eleventh Circuit has also noted "that where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement." *Thomas v. Bryant*, 614 F.3d 1288, 1311 (11th Cir. 2010) (citations omitted).

Applying the five use of excessive force factors to the conduct as depicted in the video and documentary evidence, the Court concludes that Plaintiff fails to establish, on the summary judgment record here, that Sanders, Gillespie, and Econom's use of chemical agents violated his Eighth Amendment rights. First, there is no evidence that the chemical agents caused Plaintiff any physical injury. Second, these Defendants reasonably perceived that they needed to use force given the circumstances apparent at the time. The

46

undisputed evidence shows Plaintiff covered his cell window with feces, making it impossible for correctional staff to see into Plaintiff's cell. Plaintiff testified in his deposition that he knew covering his cell window violated institutional rules, but he was angry and "rebelling" against officers. He also repeatedly and openly defied Sanders's clear instructions to uncover his window and submit to restraints for placement on property restriction. By refusing to uncover his cell window, Plaintiff presented a serious safety concern to correctional staff and himself. Indeed, when Plaintiff refused to comply with Sanders's final order, and Gillespie and Econom arrived to administer the first round of chemical agents through Plaintiff's cell door flap, Sanders, Gillespie, and Econom had no way of knowing that Plaintiff was directly in front of the cell flap prepared to successfully throw human waste at them while yelling threatening statements. Sanders, Gillespie, and Econom were then forced to obtain more PPE gear before they could administer the first round of chemical agents. Plaintiff continued to refuse orders, prompting the application of a second and third round of chemical agents.

Third, the Court considers the relationship between the need for the force and the amount of force used. Throughout the process, Sanders afforded Plaintiff many opportunities to follow orders to uncover his window and submit to restraints for placement on property restriction. But Plaintiff defied all orders and became more threatening, throwing human waste and continuing

47

to act violently until ultimately the cell extraction team was ordered. And despite facing Plaintiff's hostile behavior, Sanders, Gillespie, and Econom seemed calm and professional.

Fourth, the Court considers Defendants' efforts to temper the severity of the forceful response. Before using chemical agents, Sanders made several attempts to verbally counsel Plaintiff and gain his compliance. Plaintiff refused all orders, and even became physically aggressive before the first use of chemical agents. Before the second and third uses of chemical agents, Sanders again gave Plaintiff an opportunity to comply with verbal orders but he refused. The entire incident was video recorded, and Sanders notified the Assistant Warden who authorized each application of chemical agents.

Finally, considering how long Plaintiff continued to resist Defendants' orders and the aggressive nature of his behavior, it was reasonable for Defendants to consider Plaintiff a threat to himself and others. To that end, the undisputed evidence reveals no genuine issue of material fact about whether Sanders, Gillespie, or Econom's use of chemical agents was applied in a good-faith effort to maintain or restore discipline. These Defendants administered each use of chemical agents to quell Plaintiff's disruptive actions, and they did not do so for malicious or sadistic motives. FDOC Defendants' Motion is due to be granted on this claim.

## 2. Cell Extraction and Failure to Intervene

Plaintiff alleges that Defendants Gray, Merritt, Kurth, and VanAllen used excessive force during Plaintiff's cell extraction, violating his rights under the Eighth Amendment. Doc. 12 at 8. He also asserts Defendants Sanders, Econom, and Gillespie failed to intervene during the use of excessive physical force. *Id.* at 13. Defendants argue they are entitled to summary judgment because the force was not used maliciously and sadistically; Defendants used the minimum amount of force necessary; Defendants tried to temper the severity of the force; and Plaintiff suffered no injuries. Doc. 93 at 14-24.

Applying the five factors to the conduct as depicted in the video evidence and record documents, the Court concludes that the undisputed evidence shows no genuine issue of material fact. As to the extent of Plaintiff's injuries, the video shows that following the cell extraction, Plaintiff's face was slightly bloody, and his gait was normal. Plaintiff's medical records show that during his post-use-of-force exam, Plaintiff was alert, oriented, verbally responsive, and he expressed no complaints other than those documented. Doc. 93-11 at 285. Plaintiff's vital signs were normal, except for a slightly elevated heart rate and blood pressure. *Id.* His respirations were even and unlabored, skin was warm and dry, and he exhibited no signs of distress. *Id.* Medical documented a right swollen eye with lacerations, left swollen eye, and abrasions on the left side of his nose. *Id.* The video also shows the face lacerations were cleaned and

49

Dermabond was applied to his right eye laceration. *Id.* After receiving treatment, Plaintiff was escorted to a clean cell without incident. While Plaintiff also claims he suffered a broken pinky toe and nerve damage, records show Plaintiff did not report those ailments until over two months after the May 1, 2019, incident. Once he reported those additional injuries, medical ordered x-rays and conducted evaluations accordingly. In sum, the record evidence does not support the severe, ongoing injuries Plaintiff alleges he suffered.

Second, although the video evidence does not show the specific movements of Plaintiff, Gray, Merritt, Kurth, or VanAllen once the cell extraction team entered Plaintiff's cell, the undisputed evidence shows that Plaintiff's refusal to follow officers' orders, even after verbal counseling and use of chemical agents, necessitated the physical force. Specifically, the video shows that when cell extraction team members Gray, Merritt, Kurth, VanAllen, and Gillespie lined up with Sanders outside of Plaintiff's cell and the cell door was opened, Plaintiff was actively resisting the team's efforts to enter the cell and Plaintiff threw a cup of bodily fluids at them, hitting them all in the torso. Once inside the cell, the need for force was amplified when Plaintiff, by his own admission, refused to stop resisting and submit to restraints, and instead tucked his arms and feet under his torso.

50

Third, the Court considers the relationship between the need for force and the amount of force used. Despite being met with obvious physical resistance, Defendants appeared calm and professional while trying to restrain Plaintiff. Although the team consisted of five officers, only four of those officers fully entered Plaintiff's cell and participated in applying restraints. From the time the team entered the cell to the time Plaintiff was restrained and standing, about three minutes elapsed. Also, the video shows that after Defendants restrained Plaintiff, they stopped all physical force. *See Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) (finding no excessive force where "the officers did not apply any force after [the plaintiff] finally surrendered his hands to be cuffed," and distinguishing cases like *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002), where force was applied after "the plaintiff was already arrested and in handcuffs"). Defendants videotaped the entire cell extraction and its aftermath. And they immediately took Plaintiff to receive a medical examination after the incident. *See Cockrell*, 510 F.3d at 1312. In short, there is no genuine dispute of fact related to whether Defendants were justified in using force or whether they used only the amount of force necessary to restrain Plaintiff. The record simply does not support an inference of wantonness in the infliction of pain. *See Scott*, 550 U.S. at 380; *Brown*, 813 F.2d at 1188.

Fourth, the Court considers efforts made to temper the severity of the forceful response. In doing so, the Court notes that Defendants made many attempts and used a series of techniques to gain Plaintiff's compliance before using physical force. Sanders used verbal counseling, but Plaintiff continued to refuse orders and became increasingly disrespectful and aggressive. Based on Plaintiff's unrelenting misconduct, Assistant Warden Taylor was notified and approved the use of force. Only when chemical agents failed to gain Plaintiff's compliance did Defendants resort to physical force to restrain Plaintiff.

Finally, given how long Plaintiff continued to resist orders and his verbal and physical aggression, it was reasonable for Defendants to consider Plaintiff a threat to safety. Defendants knew Plaintiff was still refusing orders after three applications of chemical agents and they knew Plaintiff made threatening statements to officers. After opening the cell door, Plaintiff threw bodily fluids at Defendants while standing on a footlocker and actively resisted their efforts to restrain him. "Although [the Court] cannot pinpoint with precision the amount of force used by [Defendants], the fact that there was no more than minimal injury, that some amount of force was justified under the circumstances, and that the force was used for a legitimate security purpose persuades [the Court] that the evidence in this case raises only a 'mere dispute over the reasonableness of the particular use of force' and could not support 'a

reliable inference of wantonness in the infliction of pain.'" *Brown*, 813 F.2d at 1189-90 (quoting *Whitley*, 475 U.S. at 322). Thus, focusing on "the core judicial inquiry" of "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," the record shows Defendants did not use force maliciously or sadistically, but instead to maintain and restore discipline. *Hudson*, 503 U.S. at 7.

In some excessive force cases, the parties' competing versions of events are enough to defeat summary judgment. While the video does not show every move made by each Defendant or by Plaintiff, it documents the scenario sufficiently to give an objective view of what happened. The video also establishes Plaintiff's aggressive and belligerent actions, which contributed to the need for the force used against him and "obviously contradict" Plaintiff's contrary testimony. *Pourmoghani-Esfahani*, 625 F.3d at 1315. Even looking at the record in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff suffered a violation of his Eighth Amendment rights.

Likewise, since the Court finds that Defendants Gray, Merritt, Kurth, and VanAllen's use of physical force was not unconstitutional, Plaintiff's failure to intervene claims against Defendants Sanders, Gillespie, and Econom must also fail. *See, e.g.*, *Mobley*, 783 F.3d at 1357 ("[A] police officer has no duty to intervene in another officer's use of force when that use of force is not excessive."). Thus, FDOC Defendants' Motion is granted as to these claims.

### 3. Sexual Abuse and Failure to Intervene

Plaintiff claims that during his decontamination shower, Defendants Gillespie, Gray, Merritt, Kurth, and VanAllen abused him "under a homosexual context." Doc. 12 at 14; *see id.* at 7. He claims that Sanders and Gillespie "watched . . . and refused to intervene" during the "contact or penetration of the anus . . . however slight in tampering with [his] buttocks." *Id.* at 14. He also claims that Gillespie "actively participated in the homosexual abuse of illegal force in B-Wing shower." *Id.* According to Plaintiff, Sanders "ordered [and] condoned the . . . homosexual abuse in B-wing shower" as Plaintiff was in handcuffs and leg restraints *Id.* at 13. Defendants argue they are entitled to summary judgment because there is no evidence of sexual abuse. Doc. 93 at 24. According to Defendants, the decontamination shower was a routine event, and Plaintiff does not allege sufficient facts establishing Defendants intentionally engaged in sexually abusive conduct. *Id.* at 24-26.

For his sexual abuse claim to amount to an Eighth Amendment violation, Plaintiff must establish the same subjective and objective elements. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1267 (11th Cir. 2020). When considering the objective element, the Eleventh Circuit has held that "severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment." *Id.* (quoting *Boxer X v. Harris*, 437 F.3d 1107, 1111 (11th Cir. 2006)).

Here, the video evidence does not show the individual actions of Defendants or Plaintiff during the decontamination shower. Defendants have provided sworn affidavits stating that no sexual abuse occurred, and an independent investigator determined that Plaintiff's claims of sexual abuse were unfounded. Plaintiff also offers no evidence to contradict Defendants' position. Nevertheless, taking Plaintiff's allegations as true, the Court cannot find that Defendants' conduct in the decontamination shower was "sadistically and maliciously applied for the very purpose of causing harm." *Sconiers*, 946 F.3d at 1266. Indeed, a forced decontamination shower, by its very nature, may require a prison official to spray water a prisoner's genitals. *See, e.g.*, *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (holding that an officer touching a plaintiff's genitals during a strip search did not "involve a harm of federal constitutional proportions"). And the incident Plaintiff describes was isolated, brief, and not severe. *See, e.g.*, *Robinson v. Davis*, No. 3:06cv403/RV/EMT, 2009 WL 153162, at *13 (N.D. Fla. Jan. 22, 2009) (defendant's one-time touching of inmate's rear, even when combined with a threat of sexual battery, was not objectively harmful enough to show an Eighth Amendment violation).

While the Court does not condone the alleged conduct, it cannot say it rises to the level of violating Plaintiff's constitutional rights. Likewise, since the Court finds there is no constitutional violation, Plaintiff's claim that any

Defendant failed to intervene also fails. As such FDOC's Motion is due to be granted as to these claims.

## B. Defendant Espino's Motion and Supplemental Motion

In his Motion and Supplemental Motion, Defendant Espino argues he is entitled to summary judgment because:(1) Plaintiff fails to establish a constitutional violation; and (2) Espino is entitled to qualified immunity.[7] *See* Docs. 85, 146.[8] In support of his Motion, Espino submitted Plaintiff's sworn deposition (Doc. 96) and a declaration (Doc. 97) with Plaintiff's medical records (Doc. 97-1). In his Supplemental Motion, Espino also relies on FDOC Defendants' handheld video evidence summarized above. Doc. 146.

In his declaration, Espino states the following:

> At all relevant times, [ ] when I was employed at Florida State Prison, I was acting within the course and scope of my duties as medical director.

> On May 1, 2019, Plaintiff Paul Knight presented to medical claiming he suffered injuries in a use of force incident. Plaintiff presented with a swollen lacerated right eye; a swollen left eye; and[] an abrasion on his nose.

> I examined Knight on May 1, 2019. During my examination, I did not observe any other injuries other than a swollen lacerated right eye; a swollen left eye;

---

[7] Because the Court finds no constitutional violation occurred, it need not address Defendant Espino's qualified immunity argument.

[8] In his Supplemental Motion, Espino elaborates on his argument that Plaintiff fails to establish a constitutional violation by relying on the handheld video evidence. *See* Doc. 146.

and[] an abrasion on his nose. I did not observe any injuries to the top of Knight's head, toe or hands.

Knight's right eye was cleaned and Dermabond was applied. In my opinion, the laceration did not need stitches. Further, in my opinion, Knight's left eye did not need any medical treatment as it would heal on its own. After this litigation began, I have become aware that Knight made several Sick-Call Requests during his time at Florida State Prison.

Nurses generally handle Sick-Call Requests at Florida State Prison. I am not asked to address Sick-Call Requests unless the severity of the claimed sickness or injury warrants the involvement of a medical doctor.

I did not review and was not contacted to respond to any of Plaintiff's Sick-Call Requests while Plaintiff was at Florida State Prison.

A medical doctor is not required to prescribe over-the-counter medication such as ibuprofen.

In Knight's Sick-Call Request dated July 17, 2019, Knight states that he was previously beaten and complains of injuries to his eyes, nose, head, hands, elbow, little toe and fingers. I did not review and was not contacted to handle Plaintiff's Sick-Call Request dated July 17, 2019.

On July 18, 2019, Knight was examined regarding the complaints made in his Sick-Call Request dated July 17, 2019. I was not present and did not participate in Plaintiff's July 18, 2019, examination relating to that request.

On July 22, 2019, I conducted a records review of Plaintiff's July 18, 2019, examination in which Plaintiff states that he was previously beaten and complains of injuries to his eyes, nose, head, hands, elbow, little toe and fingers. In my review, I saw that

Plaintiff was scheduled for a follow-up visit. Plaintiff was examined on July 23, 2019, by a registered nurse regarding his complaints of pain in his hands and toe. Plaintiff was given and prescribed acetaminophen or ibuprofen. I was not involved in this examination.

X-rays of Plaintiff's hands and left foot were ordered by another physician on August 2, 2019, and were taken on August 5, 2019. I did not order the X-rays or participate in taking them.

I reviewed Knight's radiology reports on August 12, 2019. On August 26, 2019, I examined Knight. Knight's little toe did not show any discoloration or any other signs consistent with a fracture. While the radiology reports noted a possible fracture, based upon my visual observation of Knight, in my opinion the X-rays were within normal limits and there were no fractures of the hands or feet. I directed Knight to tape his little toe to the next toe and provided Knight tape to do so.

[ ]Generally, even when a patient presents with a fracture of the little toe, I would direct the patient to tape the toe, other times the toe is allowed to heal on its own.

After the August 26, 2019, visit, I did not hear from Knight or see Knight again.

My only involvement with Knight following the August 26, 2019, examination was to review routine laboratory and eye exam results unrelated to the injuries claimed in this lawsuit.

Doc. 97 (paragraph enumeration omitted).

Plaintiff's medical records show that on May 1, 2019, Espino conducted

the post-use-of-force exam. Doc. 97-1 at 2. Espino documented that Plaintiff's

right eye was swollen with laceration, left eye was swollen, and the left side of his nose had abrasions. *Id.* He noted that the lacerations were cleaned and Dermabond was applied to the right eye. *Id.* On July 17, 2019, over two months after the use of force, Plaintiff submitted a sick call request complaining about pain in his hands, fingers, left elbow, and left pinky toe. *Id.* at 4. Plaintiff also alleged he was sexually assaulted during the use of force. *Id.* On July 18, 2019, Nurse S. Lewis examined Plaintiff under an "Alleged Sexual Battery Protocol" and noted that Plaintiff asserted "officers stuck me between my butt cheeks with a hose in the shower," but denied penetration of the anus. *Id.* at 6. No life-threatening injuries were noted, and Espino was notified of the exam. *Id.*

Plaintiff submitted another sick call request on July 31, 2019, complaining about pain in his hands, fingers, and pinky toe. *Id.* at 14. On August 2, 2019, Dr. Baptiste examined Plaintiff and ordered x-rays. *Id.* at 15. X-rays were conducted on August 5, 2019, and Dr. Cooper concluded Plaintiff's left hand showed no fracture, no acute process osseous, structures were within normal limits, and no acute abnormality was seen. *Id.* at 17. Dr Cooper also noted that Plaintiff's left foot x-ray showed dislocation involving the fifth proximal interphalangeal joint, with a possible fracture at that site, and the rest of osseous structures were normal. *Id.* Dr. Cooper further documented Plaintiff's right hand x-ray was normal with no fractures. *Id.* at 18. On August 26, 2019, Espino examined Plaintiff and reviewed his x-rays. *Id.* at 20. Plaintiff

requested to tape his left pinky toe to the next toe, Espino provided Plaintiff with tape to do so, and Espino concluded the remaining x-rays were within normal limits. *Id.* Espino evaluated Plaintiff in October 2019 for vision assessments. *Id.* at 23.

During his deposition, Plaintiff testified he was escorted to medical following the use of force, and Espino looked at his eye and a nurse treated his injury and put Dermabond on his cut. Doc. 96 at 9. Plaintiff stated he is unaware of what additional treatment he should have received during the exam. *Id.* at 12. He explained it took about three weeks for the injuries to his eyes to completely heal. *Id.* at 14. As for his hand, Plaintiff testified that after he was transferred to Santa Rosa Correctional Institution, a nurse there advised him he had nerve damage in his hand but admitted she was the only nurse who ever told him that. *Id.* at 15-17. Plaintiff testified he should have been referred to a neurologist for the nerve damage but admitted he does not know what a neurologist would prescribe. *Id.* at 17. As for his toe, he testified that Espino provided him tape for his toe months after the incident, and he admitted he did not know what other treatment he should have been provided for the toe. *Id.* at 20. Plaintiff also testified that he suffered a head wound that bled for about twenty-four hours after the incident but resolved on its own. *Id.* at 22. Plaintiff stated he never lost consciousness during the use of force on May 1, 2019; he walked out of medical that day on his own accord; dressed

himself; showered without issue; and had no problems feeding himself. *Id.* at 29-31.

### 1. Deliberate Indifference to Serious Medical Need

Plaintiff alleges Espino acted deliberately indifferent to his serious medical needs because he simply "walked out of the exam room" and said "'that was the end of treatment'" during the post-use-of-force-exam. Doc. 12 at 9. He also asserts Espino denied treatment for his bleeding right eye, the bleeding from the back of his head, finger and hand nerve damage, and broken pinky toe. *Id.* at 11. Espino argues Plaintiff has failed to establish an objectively serious medical need, that Espino knew about a serious medical need and acted deliberately indifferent to that need, and a causal connection between Espino's actions and the claimed injuries. *See* Doc. 95.

"To show that a prison official acted with deliberate indifference to serious medical needs [under the Eighth Amendment], a plaintiff must satisfy both an objective and a subjective inquiry." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting *Farrow v. W.*, 320 F.3d 1235, 1243 (11th Cir. 2003)). First, the plaintiff must satisfy the objective component by showing he had a serious medical need. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

> "A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay

person would easily recognize the necessity for a doctor's attention.'" *Id.* (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." *Id.* (citation and internal quotations marks omitted).

*Brown*, 387 F.3d at 1351. Next, "[t]o make out the subjective component of an Eighth Amendment deliberate-indifference claim, a plaintiff must establish that the defendant (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than gross negligence." *Wade v. McDade*, 67 F.4th 1363, 1374 (11th Cir. 2023) (emphasis in original).

Even if Plaintiff established that he suffered a serious medical need, he has not shown that Defendant Espino acted deliberately indifferent to that medical need. During the post-use-of-force evaluation, conducted right after the cell extraction, the video evidence and medical records confirm that Espino evaluated Plaintiff and documented his injuries. Indeed, the video evidence shows Espino examined Plaintiff's facial injuries and Plaintiff appeared alert, conscious, and responsive during the evaluation. At Espino's direction, a nurse cleaned Plaintiff's face wound and applied Dermabond to close it.

Plaintiff testified that the laceration on the back of his head resolved within twenty-four hours and his right and left eye injuries resolved three weeks after the use of force. While Plaintiff alleges Espino did not adequately treat his hand, foot, and toe injuries, the record shows Plaintiff waited over

two months to report those injuries. Indeed, the video evidence indicates Plaintiff had no issue walking immediately following the use of force and Plaintiff never suggested he advised Espino of his hand and toe injuries during the initial post-use-of-force exam.

Still, once Plaintiff reported his hand and toe injuries, medical immediately referred him for x-rays. Espino reviewed the x-ray results and advised Plaintiff that in his medical opinion, Plaintiff's pinky toe was likely not fractured and gave Plaintiff tape to secure the injured toe to another toe. Espino also testified that even if Plaintiff's little toe was fractured, he would have still directed him to tape the toe because sometimes a little toe fracture heals without any treatment.

Finally, as to Plaintiff's alleged nerve damage, Plaintiff testified that he suffered that injury because a nurse at another institution, on a single occasion, stated he had nerve damage. But Plaintiff neither alleges that he told Espino about the nerve pain, nor does Plaintiff show that Espino otherwise had subjective knowledge of that injury.

In sum, Plaintiff fails to establish Espino knew Plaintiff suffered injuries serious enough to require more treatment than what Espino provided, but Espino intentionally refused to provide that additional treatment. Indeed, the record contains no facts permitting a reasonable inference that Espino "acted with a state of mind that constituted deliberate indifference," *Richardson*, 598

F.3d at 737, or that his physical examination and treatment of Plaintiff was "so grossly incompetent, inadequate, or excessive as to shock the conscience," *Harris*, 941 F.2d at 1495. Thus, Defendant Espino's Motion and Supplemental Motion are due to be granted.

## C. Plaintiff's Motions

In Plaintiff's Motion for Summary Judgment, which largely relies on the allegations as alleged in his unsworn Second Amended Complaint, Plaintiff argues there are no genuine issues of material fact as to his claims of excessive force, sexual abuse, and deliberate indifference to his serious medical needs. Doc. 78. Because the Court has found that Defendants are entitled to judgment in their favor, Plaintiff's Motion for Summary Judgment necessarily must fail. Thus, Plaintiff's Motion (Doc. 78) is due to be denied.

Plaintiff also filed a Motion (Doc. 144), which the Court construes as a request to file a third amended complaint. According to Plaintiff, he has information related to two unsolved murders. He contends having information about these murders "is part of experiencing emotional pain from the May 1[], 2019" incident, and he wants to amend his Second Amended Complaint to add new claims. *Id.* at 5. He also requests to speak to federal officials about the murders. *Id.* at 4. To the extent that Plaintiff is requesting to file a third amended complaint, that request is denied. As to Plaintiff's other requests, Plaintiff is advised that the Court does not have the authority to investigate or

direct other agencies to investigate crimes. As such, insofar as Plaintiff requests that this Court contact other agencies or persons on his behalf, the Court declines to grant that relief. Thus, the Motion (Doc. 144) is due to be denied.

Finally, Plaintiff files a Motion (Doc. 145), which the Court construes as a request for preliminary injunction. Plaintiff challenges the "conspiratorial conditions" of his confinement, alleging officials are denying him access to legal mail and not complying with the grievance process. *Id.* at 2. The Court previously dismissed Plaintiff's claims of conspiracy, due process, deprivation of property, and access to courts, as well as his request for declaratory relief. *See* Doc. 65. As such, his requests are unrelated to the claims remaining in this suit. *Bruce v. Reese*, 431 F. App'x 805, 806 n.1 (11th Cir. 2011); *see Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997) (recognizing that "[a] district court should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit"), *amended on reh'g*, 131 F.3d 950 (11th Cir. 1997). Also, after Plaintiff filed this Motion, he was transferred to Charlotte Correctional Institution. *See* Doc. 148. The Eleventh Circuit has held that "[p]risoners' claims for injunctive or declaratory relief regarding prison conditions generally become moot when the prisoner transfers to another prison." *Owens v. Sec'y, Fla. Dep't of Corr.*, 602 F. App'x 475, 476 (11th Cir. 2015) (citation omitted) (holding that the

prisoner's claims for injunctive relief were rendered moot by the prisoner's transfer to another prison.). Thus, Plaintiff's Motion (Doc. 145) is due to be denied.

Therefore, it is now

**ORDERED AND ADJUDGED**:

1.     Plaintiff's Motion for Summary Judgment (Doc. 78) and other Motions (Docs. 144, 145) are **DENIED**.

2.     FDOC Defendants' Motion for Summary Judgment (Doc. 93) is **GRANTED**.

3.     Defendant Espino's Motion for Summary Judgment (Doc. 95) and Supplemental Motion for Summary Judgment (Doc. 146) are **GRANTED**.

4.     The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff; terminate any pending motions; and close the case.

**DONE  AND  ORDERED** at Jacksonville, Florida, this 19th day of March, 2024.

_____

BRIAN J. DAVIS
United States District Judge


Jax-7
C:     Paul Emmanuel Knight, #63422
       Counsel of record